IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ABIGAIL F. RANSOM, et al. | § | |
| | § | |
| V. | § | A-10-CA-857 AWA |
| | § | |
| M. PATEL ENTERS., INC., et al. | § | |

**ORDER**

Before the Court are Plaintiffs' Motion for Partial Summary Judgment on the Proper Measure of Damages and Brief in Support (Clerk's Doc. No. 83); Defendants' Motion for Partial Summary Judgment: Overtime Calculation Methodology (Clerk's Doc. No. 84); Plaintiffs' Response in Opposition to Defendants' Motion for Partial Summary Judgment and Brief in Support (Clerk's Doc. No. 92); and Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Overtime Calculation Methodology (Clerk's Doc. No. 96). The Court held a hearing on the motions on September 15, 2011.

**I.      Issue Presented**

This is a collective action under the Fair Labor Standards Act of 1938, alleging that M. Patel Enterprises, Inc. ("Patel") failed to pay the Plaintiffs for overtime work. Patel denies that it violated the FLSA, and claims that the Plaintiffs are exempt from the Act and not entitled to overtime pay. The Plaintiffs contend that they were not exempt from the Act and were therefore entitled to overtime pay. The parties have filed cross-motions for summary judgment asking the Court to declare how damages should be calculated if Patel is found to have wrongfully withheld overtime pay.

It is undisputed that the Plaintiffs were hired based upon a weekly, as opposed to an hourly, rate of pay. What is unclear is how to translate this weekly salary into an hourly wage in order to

determine what the "time-and-a-half" overtime rate mandated by the FLSA is. Patel argues that the proper calculation methodology in this circumstance is what is known as the "fluctuating workweek method" (FWW). In short,[1] that method assumes that, for an employee receiving a weekly salary, the hourly rate is determined by dividing the salary by the number of hours actually worked in a given week. To then determine the overtime due, one-half of this hourly rate is multiplied by the number of hours over 40 the employee worked in that week.[2] In their cross-motion, the Plaintiffs request that the Court follow its decision in *In re EZPawn LP Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395 (W.D. Tex. 2008), and reject the FWW method. In *EZPawn*, after finding the FWW inapplicable, the Court found that the regular rate was the weekly salary divided by 40 hours, and thus the overtime pay due was one-and-a-half times that hourly rate for each hour worked over 40 in a given week. Patel argues that several decisions rendered since *EZPawn* have called it into question, and asks the Court to revisit the conclusions reached in *EZPawn*.

**II.    Legal Standard**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp.*

---

[1]The undersigned issued an opinion addressing the FWW in June 2008, and that decision explains the background of FWW in more detail. *See In re EZPawn LP Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395, 399–405 (W.D. Tex. 2008). Rather than repeat that discussion here, the Court points the reader to the *EZPawn* decision for that background.

[2]The assumption of the FWW is that the weekly salary pays not just for the first 40 hours worked, but also for all of the hours over 40. This means that the employee has received 100% of the hourly rate for all of the hours worked, and thus the only additional amount due is the 50% "overtime premium" for hours over 40. For example, if an employee's salary is $500 a week and he works 50 hours, his hourly rate for that week is $10 per hour, and the additional overtime he is entitled to is $50 (10 hours of overtime times $5 per hour, one-half of the $10 hourly rate).

*v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence demonstrating a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id*. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id*. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant

and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, then summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

### III. The *EZPawn* Decision and Basic Principles

Congress codified its findings and policy for the FLSA in 29 U.S.C. § 202. As stated in that section, Congress intended the Act to alleviate two problems: (1) overworked and underpaid employees, and (2) high unemployment rates stemming from employers hiring fewer workers and mandating longer hours. To further Congress's goals, the FLSA requires employers to pay non-exempt employees one and one-half times their regular rate of pay for any hours worked in excess of the standard 40-hour workweek. 29 U.S.C. § 207(a)(1). This provides an incentive to employers to hire more employees and reduce individual employees' workloads. *Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419, 423–24 (1945). Along with minimum wage, it keeps employers from overworking and underpaying employees.[3]

In *EZPawn* the Court explained that the Department of Labor bulletin that is the underpinning of the FWW was greatly misunderstood by the many courts that had followed it in determining damages in FLSA misclassification cases. *In re EZPawn*, 633 F. Supp. 2d at 402–03. Because that bulletin was not a regulation, and was adopted for a wholly different purpose, and further because use of the bulletin as a damage methodology was inconsistent with the Act and its

---

[3]The specifically declared policy of the FLSA is "to correct and as rapidly as practicable to eliminate [labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers] without substantially curtailing employment or earning power." 29 U.S.C. § 202(a), (b).

stated purposes, the Court concluded that it could not properly be used as a damage calculation methodology in a misclassification case. *Id.* at 405–06. Since *EZPawn* was decided, several courts have addressed this issue, with the vast majority reaching the same conclusion regarding 29 C.F.R. § 778.114—that it only applies to prospective agreements between employers and employees, and not to retrospective damage calculations.[4] In addition, several courts have followed *EZPawn* and held that § 778.114 is not a rule promulgated after notice and comment and therefore does not have the force of law.[5] Further, while several courts agreed that *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135 (5th Cir. 1988)—which arguably mandates the opposite result than that reached in *EZPawn*—was wrongly decided, they nevertheless felt bound to follow it. *Garza v. Smith Int'l, Inc.*, No. C-10-100, 2011 WL 338819, at *2–3 (S.D. Tex. Feb. 2, 2011); *Tolentino v. C & J Spec-Rent Servs. Inc.*, No. C-09-326, 2010 WL 2735719, at *3 (S.D. Tex. July 12, 2010); *Villegas v. Dependable Const. Servs., Inc.*, No. 4:07-CV-2165, at *28 (S.D. Tex. Dec. 8, 2008).

Patel concedes that § 778.114 is not a regulation, and that it cannot serve as the authority for use of the FWW in an FLSA misclassification case. Patel contends, however, that the Court must nevertheless use the FWW. Relying almost exclusively on the Seventh Circuit's analysis in *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 679 (7th Cir. 2010), Patel argues that the Supreme Court's 1942 decision in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942), mandates use of the FWW in all FLSA misclassification cases.

---

[4]*Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 679 (7th Cir. 2010); *Monahan v. Emerald Performance Mat'ls, LLC*, 705 F. Supp. 2d 1206, 1215–18 (W.D. Wash. 2010); *Brown v. Nipper Auto Parts & Supplies, Inc.*, No. Civ. A. 7:08CV00521, 2009 WL 1437836, at *6–*7 (W.D. Va. May 21, 2009).

[5]*Urnikis*, 616 F.3d at 676; *Russell v. Wells Fargo Bank & Co.*, 672 F. Supp. 2d 1008, 1016 (N.D. Cal. 2009).

IV.     Discussion

Understanding Patel's argument requires both an understanding of the Seventh Circuit's *Urnikis* decision, and of the Supreme Court's 1942 companion cases of *Missel* and *Walling v. A.H. Belo Corp.*, 316 U.S. 624 (1942).

A.      *Urnikis*

The most recent and thorough analysis of the FWW comes from the Seventh Circuit, in *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665 (7th Cir. 2010). In *Urnikis*, the plaintiff filed suit for unpaid overtime, and the district court found that she was not exempt from the Act and was therefore entitled to overtime compensation. To calculate damages, the district court, relying on § 778.114, used the FWW. On appeal, the plaintiff argued that this was error. After a detailed analysis, the Seventh Circuit concluded—as did this Court in *EZPawn*—that § 778.114 "is not a remedial measure that specifies how damages are to be calculated when a court finds that an employer has breached its statutory obligations." *Id.* at 666. It nevertheless affirmed the district court's use of the FWW method in the case because it determined that the Supreme Court's decision in *Missel* "approved [the FWW] method of calculating an employee's regular rate of pay and corresponding overtime premium." *Id.* at 666.

Brenda Urnikis-Negro worked for American Family Property Services (AFPS) reviewing appraiser reports. *Id.* at 667. Before joining AFPS, she had worked as the office manager of the loan department in a bank. *Id.* In her new job, Urnikis-Negro received a salary of $52,000 a year—a "substantial increase" from her previous salary at the bank—making her the highest-paid employee at AFPS. *Id.* She claimed that when she took the position she expected to work 40 hours a week, though she also conceded that her salary was meant to cover whatever time she worked in a given

6

week. *Id.* As noted, the district court concluded that AFPS misclassified her as exempt from the FLSA. *Id.* at 670. When it came to the question of damages, Urnikis-Negro argued that her regular rate was $25.00 per hour: $1,000 a week for 40 hours a week, and sought damages of $37.50 per hour for each hour over 40 per week. *Id.* The district court disagreed and used § 778.114(a) and the FWW to determine her regular rate of pay and overtime premium. *Id.* The district court found there was a "clear mutual understanding" that her fixed salary "serve[d] as her compensation, apart from overtime premiums, for whatever number of hours she worked." *Id.* at 671. This meant that her regular rate was $1,000 divided by the actual hours worked—in a 50-hour week, her regular rate was $20 per hour, and the overtime premium due on the 10 overtime hours was $100.[6]

In reviewing the damage calculation, the Seventh Circuit focused on the proper method for determining an employee's "regular rate." The regular rate is the employee's compensation stated on an hourly basis. 29 C.F.R. § 778.109; *Missel*, 316 U.S. at 579–80.[7] As discussed, Urnikis-Negro received an annual salary of $52,000, or $1,000 a week. To calculate the regular rate, the trial court correctly divided $1,000 "by the number of hours which the salary is intended to compensate." *Id.* at 673 (quoting 29 C.F.R. § 778.113(a)). The issue therefore centered on how many hours the $1,000 weekly salary was intended to compensate. The trial court found that Urnikis-Negro often worked beyond 40 hours and that her salary was "intended to compensate her" no matter how many

---

[6] In contrast, had the court adopted Urnikis-Negro's argument, for a 50-hour week she would have been due $375 in overtime pay—$37.50 for each of the 10 overtime hours. Thus, by rejecting Urnikis's argument, the district court "reduced her total recovery by more than 75 percent." *Id.* at 672.

[7] This is true regardless of whether an employer pays an employee by the hour; employers may pay their employees by "piece-rate, salary, commission or other basis" and conform with the Act. 29 C.F.R. § 778.109; *Missel*, 316 U.S. at 580.

hours she worked in a week. *Id.* The Seventh Circuit held that the trial court's finding—which it described as a "finding of fact"—"was not clearly erroneous" and thus affirmed it. *Id.* at 680–81.

In discussing this issue, the court considered the undersigned's ruling in *EZPawn* that it was appropriate to presume that a weekly salary was intended to cover a standard 40-hour work week, and stated that

> [a]ssuming without deciding that it might be appropriate to presume that a misclassified employee's fixed salary was meant to compensate him solely for 40 hours, the presumption cannot be irrebuttable. The employee's regular rate of pay is a factual matter, *Walling v. Youngerman– Reynolds Hardwood Co., supra*, 325 U.S. at 424–25, 65 S.Ct. at 1245. . .

*Id.* at 680. *Urnikis* may be correct on this last point, and to the extent that *EZPawn* can be read to suggest that the "traditional method" of calculating overtime is always the correct method, that conclusion is perhaps too categorical. The Court agrees that regular rate of pay *is* dependent—in part—on factual information, and a court must consider the facts before it in determining what the regular rate is in each case. What *EZPawn* (and all of the many FWW cases for that matter) demonstrate is that the facts are usually less than clear, and determining what the parties intended the weekly salary to compensate is quite challenging when the parties never discussed the issue, and operated under a mutual *mis*-understanding concerning the employee's status under the Act.

As noted, the Seventh Circuit concluded that the FWW was the appropriate methodology in *Urnikis*. It did not rest this conclusion on § 778.114, as it agreed that the bulletin "is not a remedial

8

measure that specifies how damages are to be calculated." *Id.* at 666.[8]  The court concluded that the district court had nonetheless asked the right question, if not for the right reason.  That question is:

> For what number of hours was her fixed weekly wage intended to compensate her? The court here unequivocally determined that Urnikis–Negro's wage was intended to compensate her not for 40 hours per week or some other fixed number of hours, but for any and all hours that she worked in a given week.

*Id.* at 681.  The court continued, "[g]iven this finding, it is *Missel* which dictates how the regular rate of pay must be calculated here," reasoning that

> Urnikis–Negro, like Missel, was paid a fixed weekly sum for any and all hours that she worked.  Like Missel, she routinely worked substantial amounts of overtime.  And like Missel, she never received any premium for the overtime hours she worked.  The Supreme Court held that in this situation, the employee's regular rate of pay for a given week is calculated by dividing the fixed weekly wage by the total number of hours worked in that week.

*Id.*  The irony of this conclusion is that, having just concluded that the question is dependent on the facts and the intentions of the parties, the court reaches a conclusion seemingly divorced from the

---

[8]At the hearing, Patel relied heavily on a Department of Labor Wage and Hour Division opinion letter issued after the *EZPawn* decision.  Wage & Hour Div., U.S. Dep't of Labor, *Retroactive payment of overtime and the fluctuating workweek method of payment*, Opinion Letter FLSA 2009-3 (Jan. 14, 2009). Patel argues that because this letter approves of the use of the FWW to calculate the amount of overtime due to an employee who was never paid overtime in the first instance, it is evidence that the Wage and Hour Division disagrees with the *EZPawn* decision.  Patel's reliance on the letter is misplaced. First, the letter makes no mention of *EZPawn* or *Urnikis*, but rather cites to two appellate decisions that most of the courts to look at this issue carefully have agreed incorrectly viewed § 778.114 as remedial.  *See, e.g. Urnikis*, 616 F.3d at 678 (criticizing cases).  Second, the factual scenario addressed in the opinion letter did not involve any litigation, but rather an employer's voluntary reconciliation after realizing it had not paid overtime.  As this Court has noted several times, § 778.114 is appropriate for use when an employer and employee have agreed on the terms of the employment, which the opinion letter found had occurred there  Finally, as an opinion letter, the communication is only deserving of as much deference as the circumstances dictate, *EZPawn*, 633 F. Supp 2d at 402-403, ranging from "great respect at one end to near indifference at the other." *U.S. v. Mead Corp.,* 533 U.S. 218, 228 (2001).  For the reasons articulated in *EZPawn*, and echoed in *Urnikis*, 616 F.3d at 682 n.9, the opinion letter adds nothing to the analysis, and is deserving of little weight in this discussion.

facts, as it is a result that would be mandated in almost *every* case. By definition, in a misclassification case the employee will have been "paid a fixed weekly sum for any and all hours that she worked," will have "routinely worked substantial amounts of overtime," and will have "never received any premium for the overtime hours she worked." If this is all it takes to require that the FWW be used to calculate the regular rate, then the facts really don't matter. In the end, then, the *Urnikis* court's conclusion that *Missel* dictated the result there is unpersuasive, because the court's conclusion is inconsistent with the language in *Missel* (as well as its companion case, *Belo*) holding that determining the regular rate is a fact-dependent inquiry.

So while the *Urnikis* decision is for the most part thorough and careful, it stumbles at the end and too quickly determines that *Missel* answers the question. As set forth in the next section, a closer look at *Missel*, as well as at the other FLSA case decided the same day, *Walling v. A.H. Belo Corp.*, 316 U.S. 624 (1942), suggests that the answer is not so clear.

    **B.**    ***Missel* and *Belo***

In 1942, as the first few cases litigating the FLSA reached the Supreme Court, the Court decided *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942), and *Walling v. A.H. Belo Corp.*, 316 U.S. 624 (1942). In both cases, the Court confronted how to calculate the "regular rate" of pay under the Act. *Missel* dealt with one employer's approach to determining the regular rate. Missel started his job before the effective date of the FLSA, and thus initially was not entitled to any additional pay for overtime hours. *Missel*, 316 U.S. at 574. Missel had an agreement that paid him a weekly wage for fluctuating hours—he received $27.50 per week for most of the time after the effective date of the FLSA no matter how many hours he worked. *Id*. After the passage of the Act, the company continued to pay him a fixed salary for fluctuating hours and did not pay him overtime,

even though he often worked more than 65 hours in a week and occasionally worked 80 hours in a week. *Id.* The company justified its payment scheme by asserting that Missel always made more than minimum wage for the first 44 hours in the week and more than 150% of minimum wage for the hours worked in excess of 44. *Id.* at 581.[9] In effect, the company was arguing that the "regular rate" was the minimum wage.

      The Court rejected this justification, voided the employment contract, and held that Missel was entitled to overtime pay. *Id.* It determined that Missel's weekly wage only compensated him for the hours he worked and did not include an overtime premium. *Id.* at 580. By requiring the company to pay Missel overtime in addition to his salary, the Court furthered the purposes of the FLSA: creating a financial incentive for employers to hire more employees and work them fewer hours. *Id.* at 577–78. The Court stated that it had "no problem . . . assimilating the computation of overtime for a fixed weekly wage for regular contracts hours" to an employment contract "for a weekly wage with variable or fluctuating hours." *Id.* at 580. In concluding that the "regular rate" in these circumstances was the weekly salary divided by the number of hours actually worked each week, the Court did not consider other possible methods for determining the regular rate of pay, nor did it address whether a different method might be appropriate in different circumstances. Important to the Court were the facts that Missel and Overnight had entered into a contract that Missel would work a fluctuating workweek and that he worked under the agreement for several years.

      The companion case, *Walling v. A. H. Belo Corp.*, 316 U.S. 624 (1942), presented a slightly different question: where there is a contract, is an employee's regular rate dictated by the contract

---

[9]At that time, overtime pay was due after 44 hours worked in a week, rather than 40 hours as the Act now provides.

rate or by the actual pay given to the employee. In *Belo*, the company had contracts with its employees to pay them 67 ¢ an hour, and which also provided the employees with a minimum of $40 per week. *Id.* at 628. The company brought a declaratory judgment suit to validate this arrangement and argued that the 67 ¢ rate should constitute the regular rate. *Id.* at 629–31. Walling, the Administrator of the Wage and Hour Division of the Department of Labor, argued that the regular rate should be calculated using the FWW method: the $40 contract minimum divided by the numbers of hours actually worked. *Id.* at 631.

The Court declined to use the FWW, offering several reasons. First, the employee could earn more than the guaranteed weekly wage if he worked over 54.5 hours. *Id.* Second, the contract stated that the employees would receive 67 ¢ per hour for the first 44 hours and then receive "not less than one and one-half time such basic rate" for each additional hour. *Id.* at 632. The Court offered as an example an employee who worked for 50 hours: the employee's "$40 wage consists of $29.48 for the first 44 hours (44 X $.67) plus $10.52 for the remaining six hours (6 X $1.753)." *Id.* The last six hours paid at $1.753 exceed 150% of 67 ¢. The Court expressed skepticism that the FWW method was always the appropriate means to calculate the regular rate. It recognized that the FWW method changes the "regular rate" weekly, so it is more appropriately labeled "irregular." *Id.*

After declining to use the FWW method, the Court then considered two plans proposed by the Administrator. The first, the "time-off plan," required a minimum of two-week pay periods, and "if the pay period is set at two weeks and the employee is required to work overtime during the first week, he is given sufficient time off during the second week to keep his paycheck at a constant level." *Id.* at 633. The second, the "pre-payment plan," let the employer offset future wages if the employee does not work enough to earn the guaranteed weekly wage using the hourly rate in the

contract. *Id.* Because the Court found that the "pre-payment plan" was almost identical to the "guaranty plan" adopted by Belo, already at issue before it, it dismissed that plan as a true alternative to Belo's plan. *Id.* at 634.

Finally, the Court contrasted the employer's approach in *Belo* with that in *Missel*, where the contract did not have a stated hourly wage or a provision for overtime. *Id.* Using the wages and hourly rates in *Belo*, the Court compared how much the respective companies would owe an employee who worked 65 hours under the *Missel* arrangement ($46.38), and the *Belo* contract ($50.48), and found both plans valid. *Id.* Despite the "difference in compensation," the Court allowed both plans because it "is the *agreement* of the parties and it is within the letter and the intention of the law." *Id.* (emphasis added). The Court refrained from announcing a rigid, per se rule:

> Presumably Congress refrained from attempting such a definition because the employment relationships to which the Act would apply were so various and unpredictable. And that which it was unwise for Congress to do, this Court should not do. When employer and employees have *agreed upon an arrangement* which has proven *mutually satisfactory*, we should not upset it and approve an inflexible and artificial interpretation of the Act which finds no support in its text and which as a practical matter eliminates the possibility of steady income to employees with irregular hours.

*Id.* at 634–35 (emphasis added).

Thus, any claim that the Supreme Court adopted a rigid damage rule in *Missel* and *Belo* is fundamentally flawed. This is why both Patel's argument, and the *Urnikis* decision, are incorrect. The FLSA, *Missel*, and *Belo* all require a fact-specific inquiry, and a categorical approach is thus wrong. As noted earlier, while *Urnikis* recognized the fact-specific nature of the inquiry, it failed to adopt a damage methodology consistent with this recognition; instead, it concluded that *Missel*

required it to calculate the regular rate under the FWW whenever an employee was salaried, consistently worked more than 40 hours, and was never paid any overtime premium. Because *Missel* does not mandate that result, but rather requires a more subtle factual review, *Urnikis*'s conclusion in this regard is incorrect.

### C. The Result?

So we return to where we started. How should a court calculate damages in a misclassification case? In short, it depends. Where there are enough facts from which to conclude that the parties actually had an understanding about how many hours the salary was intended to compensate, then those facts will determine the regular rate, and thus the damages.

But what about when there are no facts on the issue? Indeed, the very formulation of the issue—how many hours was the weekly salary *intended* to cover—begs the question, "intended by whom?" It cannot be solely the intention of the employer that matters, for the very foundations of both *Missel* and *Belo* were the parties' mutual agreements. Determining the parties' intentions in those cases was less of a challenge because there were *actual* agreements between the employers and employees. But what if there is no agreement, and the only facts are that the employee applied for and accepted a job represented to be a salaried position, and accepted the weekly checks without objection, thinking he was not entitled to overtime pay?

Patel would say that the Court should infer from such facts that the employee implicitly agreed that the salary would compensate the employee for however many hours he actually worked. *Urnikis* suggests a similar inference. *See Urnikis*, 616 F.3d at 681 n.8. ("We note that the agreement that an employee is to be paid a fixed salary for whatever hours she worked need not be evidenced in writing. The existence of such an agreement instead may be inferred from the parties' conduct.")

(citations omitted). But that would seem to read far too much into such limited facts. If the Plaintiffs are found to be non-exempt, then in this case, as in most such cases, the parties have based their actions on a mutual mistake: the Plaintiffs went to work without demanding overtime payments, and Patel employed them believing they were not entitled to overtime pay. Patel's position is that the Court should ignore this mistake, in effect asserting that the employees consented to a fixed salary compensating them for the hours actually worked once they went to work and cashed their paycheck. But how does an employee avoid this result? Should she demand overtime payments when she receives her first check, despite operating under the incorrect assumption that she's not entitled to overtime pay? After her second check? At what point does an employee "consent"?

So, under this approach, if an employee fails to complain about not receiving overtime pay when she has been told she is not entitled to it, then she is taken as having agreed to the salary compensating for whatever hours she is required to work. This seems an impossible burden. Notably, the record in this case demonstrates that several Plaintiffs quit their job within months of being promoted or hired into salaried positions, in very hard economic times when jobs are difficult to come by.[10] Is this evidence that the Plaintiffs did *not* expect to work more than 40 hours per week? Further, several Plaintiffs testified in their deposition that they thought they would work approximately 55 hours a week. So is the regular rate in those cases the salary divided by 55 hours? Further, unlike *Urnikis*, where the plaintiff was paid $1,000 per week, many of the Plaintiffs in this case were earning salaries as low as $480.77 per week while working extraordinarily long hours.

---

[10] According to the Plaintiffs' declarations, the district manager, Patti Tomasek, told salaried "executive managers" who complained about their hours that they should consider themselves lucky to have a job. Declaration of Abigail Ransom ¶ 10; Declaration of Bonnie Kurz ¶ 10; Declaration of Lori Hopmann ¶ 10; Declaration of Daniel Owings ¶ 10.

In fact, when their salaries are converted to an hourly rate, several plaintiffs were paid less than the minimum wage, and most others were paid only slightly above it.

So, to return to the ultimate question. When the facts are unhelpful (or better put, non-existent), what should a court's default position be? The Seventh Circuit noted that even if "it might be appropriate to presume that a misclassified employee's fixed salary was meant to compensate him solely for 40 hours, the presumption cannot be irrebuttable." *Id.* at 680. Even if this proposition is accepted, it surely cannot be not enough to rebut such a presumption to merely show that an employee took a job, showed up to work, and accepted their paycheck without objection, all while under the false belief that they were entitled to no more.[11] When a court has reached the question of damages, the equities are no longer equal: the employer illegally underpaid its employee. And courts are directed to interpret the FLSA broadly in favor of employees. *Allen v. McWane, Inc.*, 593 F.3d 449, 452 (5th Cir. 2010). Given this, it would seem that the correct approach when there is no persuasive evidence, direct or circumstantial, of a contrary agreement, is to presume that a weekly salary paid to a non-exempt employee compensated them for 40 hours of work.

---

[11]The significance of the employee's lack of knowledge of non-exempt status cannot be overstated. The fundamental assumption underpinning the FWW is that it is fair to use it to calculate overtime pay because the employee consented to the payment scheme. But in the context of an FLSA misclassification suit when consent is inferred from the employee's conduct, that conduct will always, by definition, have been based on the false assumption that he was not entitled to overtime compensation. The job will have been advertised as a salaried position. The employee, if he raised the issue, will have been told that the salary is all he will receive, regardless of how many hours he works. That is the very nature of a salaried, exempt position. When it turns out that the employer is wrong, and it is learned that the FLSA required the employer to pay the employee an overtime premium, the notion that the employee's conduct *before* he knew this is evidence that the employee somehow consented to a calculation method for the overtime pay *that no one even knew was due*, is perverse. If the FWW requires consent in some fashion, the employee's actions before he knew he was due overtime pay just cannot logically be the basis of that consent.

Here, Patel has failed to offer persuasive summary judgment evidence that the mutual intention of the parties was that the flexible workweek method should be used to calculate the amount of overtime pay due to the Plaintiffs should they be found to be non-exempt. On the other hand, the Plaintiffs are also not entitled to summary judgment. Determining the proper overtime calculation method is a fact-dependent inquiry, and the facts are in dispute or are insufficiently developed on this question. Accordingly, the Court DENIES both Plaintiffs' Motion for Partial Summary Judgment on the Proper Measure of Damages and Brief in Support (Clerk's Doc. No. 83), and Defendants' Motion for Partial Summary Judgment: Overtime Calculation Methodology (Clerk's Doc. No. 84).

With regard to the handling of these issues as trial, the parties have stipulated regarding the number of hours worked by the Plaintiffs and the salary each was paid during the relevant period, and thus, as noted in the Court's order of August 25, 2011, there are no issues to send to the jury on damages. The sole remaining question—the proper methodology for calculating damages—is a question to be decided by the Court. *See Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743(1981) ("FLSA claims typically involve complex mixed questions of fact and law—e. g., what constitutes the 'regular rate,' . . . ."). To the extent factual findings need to be made to make that determination, the Court will make those findings based on the evidence presented at trial.

SIGNED this 1st day of November, 2011.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE