IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ABIGAIL F. RANSOM, et al. | § | |
| | § | |
| V. | § | A-10-CA-857 AWA |
| | § | |
| M. PATEL ENTERPRISES, INC., et al. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Brief on Liquidated Damages (Clerk's Doc. No. 167); Defendants' Brief on Damage Calculation (Clerk's Doc. No. 168); Plaintiffs' Brief in Support of Actual and Liquidated Damages (Clerk's Doc. No. 169); and Defendants' Response to Plaintiffs' Brief Regarding Actual Damages (Clerk's Doc. No. 170). On December 7, 2011, the Court held a hearing on the motions.

**I.  BACKGROUND**

On November 14, 2011, this FLSA collective misclassification action was tried to a jury, and the jury returned a verdict finding that the Plaintiffs had been misclassified as exempt employees. The jurors also found that the Defendants were not willful in their misclassification of the Plaintiffs. As the Court noted in its previous orders, it will determine the amount of damages owed to the Plaintiffs. To do so, the Court must determine the proper method for calculating actual damages, and decide whether the Plaintiffs should receive liquidated damages.

**II.  ACTUAL DAMAGES**

To determine the amount of actual damages, the Court must answer two separate questions: (1) how should the Plaintiffs' "regular rate" be calculated; and (2) should the Court employ the "fluctuating work week" method of calculating damages, the traditional method, or some variation thereof.

### A. Regular Rate

For purposes of the Fair Labor Standards Act, the regular rate "is a rate per hour." 29 C.F.R. § 778.109. Because the Plaintiffs received a weekly salary, the Court must convert their salaries to an hourly rate. The relevant Department of Labor regulations explain how to calculate a salaried employee's regular rate: "If the employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113(a). The Plaintiffs propose that the Court calculate the regular rate here using the method outlined in the undersigned's decision in *In re EZPawn LP Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395 (W.D. Tex. 2008). The Defendants propose that the Court use the fluctuating workweek method (FWW).

The Court discussed the competing damage calculation methods for misclassification cases at length in its previous order, Clerk's Doc. No. 125, and will not repeat that discussion here, beyond that which is necessary to calculate damages for this case. As noted in that order, few circuits have addressed the correct damage calculation model with depth. The most thorough discussion is found in *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665 (7th Cir. 2010), and the Defendants repeatedly point to that decision in support of use of a "pure" FWW calculation in this case. In fact, *Urnikis* supports the model proposed by the Court in its order setting the hearing on damages, which is not the same as what the Defendants propose. Specifically, the Seventh Circuit endorsed calculating the regular rate by dividing the plaintiff's weekly salary "by the number of hours which the salary is intended to compensate," *Urnikis*, 616 F.3d at 673 (quoting 29 C.F.R. § 778.113(a)), as opposed to the number of hours the employee actually worked each week. While it is true that

the Seventh Circuit approved a calculation where the actual hours worked each week was used, they did so based on findings made by the trial court, to which they gave great deference. *Id.* at 681. Further, as discussed in more length in the Court's prior order, the *Urnikis* court's identification of the facts which supported the finding that the salary in that case was intended to compensate Urnikis for all of the hours she worked, is suspect. Its approach—focusing on whether the employee was "paid a fixed weekly sum for any and all hours that she worked," had "routinely worked substantial amounts of overtime," and had "never received any premium for the overtime hours she worked"—engulfs every misclassification case. Clerk's Doc. No. 125 at 10 (citing *Urnikis*, 616 F.3d at 681).

The Court has explained in both the *EZPawn* opinion, as well as the earlier opinion in this case, why it is difficult in a misclassification case to have a discussion regarding what the employer and employee intended regarding how many hours a weekly salary is supposed to compensate. Not the least of the reasons for this is that in virtually every such case the employer and employee will simply never have discussed the issue. When the fundamental assumption at the beginning of the employment relationship is that a job is an exempt salaried job, there is no reason to talk about overtime, and how many hours the weekly salary is supposed to compensate for. It is ignoring reality to conclude from this silence—as so many courts have—that the parties must have intended the salary to compensate for all of the hours worked, no matter how many those were, even if the position was found in the future to be non-exempt. Put another way, it is a fallacy to speak of the parties' "intentions" regarding the number of hours the salary in a misclassification case was supposed to compensate for, when those intentions were informed by a faulty understanding of the correct classification of the position.

The Court has already addressed many general questions in this area, including where the starting point should properly be set. On that issue, the Court concluded "when there is no persuasive evidence, direct or circumstantial, of a contrary agreement, [a court should] presume that a weekly salary paid to a non-exempt employee compensated them for 40 hours of work." Clerk's Doc. No. 125 at 16. Here, the evidence at trial demonstrates persuasively that the parties did in fact discuss how many hours the weekly salary was intended to compensate. Almost all the Plaintiffs who testified stated that when hired they were told they would work a minimum of 55 hours per week. On the work schedules, the Plaintiffs were ordinarily scheduled to work 55 hours each week. The Plaintiffs testified that while they worked varying hours, in a normal week, they worked about 55 hours. *E.g.* Clerk's Doc. No. 161, 126:24–127:3 (Kurz); Clerk's Doc. No. 162, 143:13–16 (Henneman); Clerk's Doc. No. 163, 82:10–19 (Ransom). This is confirmed by Plaintiffs' Exhibit 1, which shows that many of the Plaintiffs averaged close to 55 hours a week. The Defendants' testimony is also consistent with this. Mitesh Patel testified that the Plaintiffs were expected to work a minimum of 50–55 hours per week. Clerk's Doc. No. 165, 95:19–21. The Defendants' district manager, Patti Tomasek, also testified that the minimum work week for managers was 55 hours. Clerk's Doc. 172, 35:8–11.

The Court therefore finds that the parties intended the weekly salary to compensate for a 55-hour workweek. The Court will therefore use a 55-hour week in determining the regular rate.[1]

---

[1] A trial court in the Eleventh Circuit apparently used a similar method in determining the regular rate in an FLSA case, using a 52-hour week. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1258 n.34 (11th Cir. 2008) (acknowledging that the jury used Family Dollar's damage calculations that "divided the store managers' base salary by 52 hours (not 40 or 48 hours) to determine the hourly rate of pay for Family Dollar's overtime pay calculations").

**B.     Damages Calculation**

Under the FLSA, a non-exempt employee is entitled to one and one-half times their regular rate for all hours worked over 40 hours.  29 U.S.C. § 207(a)(1).  Given the finding of the prior section that the weekly salary is properly viewed as payment for 55 hours of work, this means that for the hours from zero to 40, the Plaintiffs have been paid all they are entitled to; for hours over 40 and up to 55, they have been paid only the regular rate; and for hours over 55, they have not been paid at all.  For the purpose of calculating damages, the Plaintiffs are therefore entitled to one-half the regular rate for each hour worked over 40 up to 55, and for all hours over 55, the Plaintiffs shall receive one and one-half times their regular rate.

To give an example using evidence from the trial, for the week of August 10, 2009, Vernon Henneman worked 90.78 hours and received $480.77.  As discussed above, his regular rate is $480.77 divided by 55 hours, which is $8.74 per hour.  As noted, he had already received his regular rate of $8.74 per hour for the hours from 40–55, but is also entitled to a 50% overtime premium for those hours, which comes to $65.66.[2]  And he should have also received one and one-half times his regular rate for hours from 55–90.78.  This comes to $469.08.[3]  For this week, he is therefore entitled to $534.74 in damages (on top of the $480.77 he was already paid for that week).

There is a subsidiary question raised for a few Plaintiffs for certain weeks, where, given the number of hours they worked, they were paid less than the minimum wage.  The example just used is one of those weeks, as the actual pay ($480.77) divided by the actual hours worked (90.78) results in an hourly rate of $5.30 an hour.  The minimum wage at this time was $7.25 per hour.  *See* 29

---

[2]$8.74 x 0.5 = $4.37 x 15 hours = $65.66.

[3]$8.74 x 1.5 = $13.11 x 35.78 hours = $469.08.

U.S.C. § 206(a)(1)(C). For weeks such as this one, the Plaintiffs request that, in addition to overtime pay damages, the Court also award the Plaintiffs the difference between the minimum wage ($7.25), and the rate actually received ($5.30), for every hour they worked in that week. Using the example of the week just discussed, this would mean additional damages of $1.95 per hour times 90.78 hours, or $177.02. Plaintiffs acknowledge that this could be viewed as double counting, but argue that the policies of the minimum wage law and the overtime pay statute are distinct, and each is a distinct requirement meriting separate and distinct damage awards.

The Court disagrees. While the Plaintiffs are correct that the overtime and minimum wage laws are distinct, the purpose of compensatory or actual damages is to make a plaintiff whole, to give the plaintiff what he was entitled to had the law been complied with. Thus, for example, in the week of August 10, 2009, Mr. Henneman was entitled to receive overtime pay of one and one-half times the regular rate for all hours over 40, and also to a regular rate that was at least $7.25 per hour. As already discussed in the earlier example, from an overtime pay standpoint, Henneman should have received $1,015.51 for that week, which represents $8.74 per hour for the first 40 hours, and $13.11 for the next 50.78 hours. By receiving that compensation, he will also be made whole for the minimum wage underpayment he suffered. It puts him in the same position that he would have been in had the Defendants complied with the FLSA on both fronts. Thus, Plaintiffs are not entitled to additional damages for the weeks in which they were paid less than the minimum wage.

### III.  LIQUIDATED DAMAGES

The Court must also determine whether to award liquidated damages. Section 216(b) provides for "an additional equal amount in liquidated damages." 29 U.S.C. § 216(b). The purpose of liquidated damages is to "compensate an employee for delay in payment." *Reich v. Helicopter*

*Servs., Inc.*, 8 F.3d 1018, 1031 (5th Cir. 1993) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 715–16 (1945)).  The general rule is that a court should award the amount found for actual damages as liquidated damages.  *Singer v. Waco, Texas*, 324 F.3d 813, 822–23 (5th Cir. 2003).  As the Fifth Circuit noted in *Singer,*

> Under the FLSA, an employer who violates the overtime provisions is liable not only for the unpaid overtime compensation, but also for ''an additional equal amount as liquidated damages.''  29 U.S.C. § 216(b).  At one time, this liquidated damages assessment was mandatory.  *See Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 (5th Cir.1998).  However, the district court can now decline to award such damages (or reduce the amount) if the court concludes that the employer acted in ''good faith'' and had ''reasonable grounds'' to believe that its actions complied with the FLSA.  29 U.S.C. § 260.

*Singer*, 324 F.3d at 822–23; *see also* 29 C.F.R. § 790.22(b).  It is the employer's burden to prove good faith and reasonableness.  *Lee v. Coahoma Cnty., Mississippi*, 937 F.2d 220, 227 (5th Cir. 1991); *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 925 (E.D. La. 2009).

If the jury concludes that the employer has willfully violated the FLSA, the employer cannot demonstrate good faith, and the court must award liquidated damages in the full amount.  *Singer*, 324 F.3d at 823 (citing *Heidtman v. El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999)); *Lee*, 937 F.2d at 226.  But "[a] finding that defendant's actions were not willful does not preclude a finding that defendant did not act in good faith and on reasonable grounds."  J*ohnson*, 604 F. Supp. 2d at 926 (citing *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008) ("Because the burden of proof is placed differently, a finding that willfulness was not present may co-exist peacefully with a finding that good faith was not present.")).

The employer's burden to demonstrate good faith and a reasonable belief that its actions complied with the FLSA is "substantial."  *Singer*, 324 F.3d at 323; *Mireles v. Frio Foods, Inc.*, 899

F.2d 1407, 1415 (5th Cir. 1990). "Good faith cannot be based on ignorance, but instead 'requires some duty to investigate potential liability under the FLSA.'" *Johnson*, 604 F. Supp. 2d at 926 (quoting *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468–69 (5th Cir. 1979)). The employer must show that it "had an honest intention to ascertain what the Act requires and to act in accordance with it." *Id.* (citing *Dybach v. Florida Dept. of Corr.*, 942 F.2d 1562, 1566 (11th Cir. 1991) (internal citations omitted)). Even if the court concludes that the employer acted reasonably and in good faith, there is a "strong presumption . . . in favor of doubling." *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 929 (quoting *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 733 (7th Cir. 1998)). "Doubling of an award is the norm . . . ." *Id.* (discussing the Family and Medical Leave Act, which uses essentially the same damages scheme as the FLSA).

The Defendants offer three arguments why the Court should find that they acted in good faith: (1) a prior Department of Labor (DOL) investigation found a similar position exempt; (2) the Defendants added duties to the Plaintiffs' position when the Defendants became Party City franchisees; and (3) the classification in this case was a "close call." The Plaintiffs dispute the Defendants' justifications, and they also point to the Defendants' reticence to pay overtime as evidence that the Defendants did not act in good faith.

### A. The Department of Labor Investigation found the assistant manager position at Party Pig exempt.[4]

Prior to purchasing a Party City franchise, the Defendants operated their stores under the name "Party Pig." In 2001 and 2002, the DOL investigated Party Pig on wage and hour issues, and the initial investigator determined that Party Pig failed to pay overtime to a number of employees,

---

[4]The findings in this section are based on the trial testimony of Mitesh Patel, as well as the DOL records related to the investigation, filed as Clerk's Doc. No. 167-3.

including employees with the title of assistant manager. The Defendants requested to meet with the investigator's supervisor, the director of enforcement, and contest the investigator's conclusions. A subsequent meeting occurred—which, according to Mitesh Patel, took an hour and a half—attended by the investigator, the director, and the Patels. At the meeting, Patel went through the assistant manager's responsibilities, and the director indicated that he thought that they should be exempt. Clerk's Doc. No. 164, 112:25–113:19. That finding was confirmed the next day.

The Defendants point to these events and their reliance on the DOL's conclusion as evidence of their good faith in attempting to comply with the FLSA. The Plaintiffs respond by arguing there were several reasons why the Defendants should not have relied on the DOL's reversal: (1) the DOL investigated the assistant manager position at Party Pig, and the Plaintiffs were executive managers for Party City several years later; (2) the DOL reversed its previous finding that the assistant managers were not exempt without a detailed analysis of the facts; and (3) the regulations changed substantially in 2004, after the DOL investigation.

It appears from the DOL's records that although the investigator concluded that the assistant managers were not exempt, within 24 hours of meeting with Patel and the investigator's supervisor—and without any additional fact findings beyond the discussion with Patel—the DOL reversed position. In the first letter from the DOL to the Defendants, the investigator stated that she denied the Defendants' executive exemption for the assistant managers "since the employees did not meet the duties test. These employees' primary duties involved routine manual work such as stocking merchandise on shelves, pricing merchandise, and assisting customers with their purchasing needs." Clerk's Doc. No. 167-3 at 6. In notifying the Patels of its reversal in position, the DOL merely stated that Party Pig "was allowed the exemptions for those employees." *Id.* at 5. No new

9

facts are discussed, and no explanation for the change in opinion is given. Indeed, there is no new fact findings in the second letter to reverse the initial finding that the assistant managers' primary duties involved stocking and pricing and assisting customers. This quick and cursory reversal, with no explanation for the change in classification, does not provide great support for the Defendants' claim of good faith. The DOL investigation involved a different position for a different company. The decision was made in early 2002, based on facts gathered in 2001, whereas the period at issue here is several years later. The duty to show good faith requires affirmative acts to remain informed on the FLSA and to take steps to comply with it. By the time relevant to this case, reliance on the 2001-2002 DOL investigation by itself is insufficient to show good faith.

Moreover, the DOL regulations governing exempt employees changed substantially in 2004. Both at trial and in the damages hearing, the Defendants and their counsel repeatedly asserted that the 2004 changes in the regulations liberalized the exemptions and made more people exempt. This is inaccurate. The regulations raised the salary requirements from $155 a week to $455 a week before an employee could qualify as exempt. This by itself added many more workers to the non-exempt group.[5] Second, the DOL changed the duties test for the executive exemption, and described that test as "equally *or more* protective than the short duties test currently applicable. . . ." 69 Fed. Reg. 22123 (Apr. 23, 2004) (emphasis added). In its summary of the major changes and impacts of the amendments, the DOL stated that the changes "to both the salary tests and the duties tests are necessary to restore the overtime protections intended by the FLSA which have eroded over the

---

[5]"Because of the increased salary level, overtime protection will be strengthened for more than 6.7 million salaried workers who earn between the current minimum salary level of $155 per week ($8,060 annually) and the new minimum salary level of $455 per week ($23,660 annually)." 69 Fed. Reg. 22123 (Apr. 23, 2004)

10

decades." *Id.* at 22122.  According to the DOL, this new duties test, "consisting of the current short test requirements plus a third objective requirement taken from the long test, was more protective than the existing 'short' duties test applied to employees earning $250 or more per week ($13,000 annually)." *Id.* at 22130–31.   The testimony showed that the Defendants did little to become familiar with these new regulations.  Mitesh Patel's testimony conflicted on how much he knew about the changes and what he did to comply with them.  Indeed, when first asked at trial about anything he had done to review the classification of the executive managers after 2004, he stated he had not taken any actions after that time to ensure compliance with the Act.  Clerk's Doc. No. 165, 83:12-84:9.  He further confirmed that he had testified similarly in his deposition.  *Id.* at 84:10-20.  He then modified that testimony at trial, stating that he recalled hearing about the minimum salary increase change to $455.  Clerk's Doc. No. 165, 54:5–56:8.  But even crediting his trial testimony, at best all he did was read the "lawyer language" on the DOL's website.  Clerk's Doc. No. 164, 81:2-12.  He did not hire a lawyer or consult with a human resources professional.  *Id.* at 72:3–11.  Rather, the Defendants assumed that Party City's corporate human resources team had performed "their due diligence" and concluded that the executive manager position was salaried.  *Id.* at 72:18–73:9.  Thus, the only hard evidence of the Defendants' reaction to the 2004 amendments was Defendants' increase of the weekly salaries of a few employees who had until then been paid less than $455 per week, to comply with the higher wage requirement of the amendments.

      **B.**    **The Defendants added more duties to the executive manager position.**

According to Patel's testimony, after joining the Party City franchise, the executive managers received additional responsibilities which made their positions even more solidly exempt.  Clerk's Doc. No. 164, 68:21–24.  Chief among the new duties was implementing weekly "plan-o-

11

grams"—store merchandise planners sent from Party City's headquarters that franchisees were required to implement. *Id.* at 122:24–123:2. The Court is not persuaded by this claim, however, because, if anything, the additional duties actually made it more likely that the managers were non-exempt, as the duties were not "managerial" under DOL regulations.

There is no question that following the plan-o-grams took a large amount of time, and that they were important to the Defendants because of the apparent strictness with which Party City enforces the requirement that they be followed. As noted earlier, the plan-o-grams provided a detailed map of precisely how and where the Plaintiffs should place merchandise and marketing materials in their stores. According to the Defendants, if they failed to closely follow the planners, then the Defendants could lose their franchise license. They repeated in their testimony several times the story of the one instance in which they received notice from Party City that they were not in compliance with their franchise agreement because they had not followed the plan-o-gram in laying out their merchandise. The Patels thus required that the plan-o-grams be followed down to the last detail. But rather than making the executive managers' exempt, giving them the duty of carrying out the instructions of the plan-o-grams significantly dampened the executive managers' autonomy to make independent decisions. The weekly planners effectively reduced the executive manager's discretion. Thus, the evidence at trial demonstrated that even if the executive manager position at Party City started out the same as the assistant manager position had been at Party Pig, and even if the Patels relied in good faith on the earlier DOL investigation's outcome, becoming a Party City franchisee added significant menial duties to the executive managers' job, significantly reducing their discretion. The Patels' reliance on the fact that they had added duties to their assistant manager

position after becoming a franchisee, without an examination of whether those duties were managerial or not, does not assist them in their claim to have acted in good faith.

### C. The classification issue here was a "close call."

Finally, the Defendants argue that classifying an employee as exempt is a fact-specific inquiry, and because this case is a "close call," they should be found to have acted in good faith. They point to the fact that the Court did not grant summary judgment for either side—and that the parties were forced to go to trial to have the issue resolved—as evidence of the "closeness" of the case. This argument lacks merit, for if this demonstrated good faith, then no FLSA plaintiff would be entitled to liquidated damages when their case went to trial. This, of course, is not the law, as the default position in FLSA cases is to award liquidated damages. Allowing a defendant to escape liquidated damages simply by showing this type of evidence would effectively eliminate liquidated damages altogether. In the Defendants' damages brief, they further claim that in cases with similar facts courts have granted summary judgment for employers. Leaving aside the difficulty of comparing this case to others when all there is to examine in the other cases is an appellate opinion and no record, the fact remains that a 10-person jury unanimously found that the Plaintiffs were not exempt. The "close call" defense is not a valid reason for the Court to conclude the Defendants acted in good faith here.

### D. The Defendants showed reticence towards paying overtime.

The Plaintiffs separately contend that the evidence at trial demonstrated that the Defendants affirmatively avoided paying overtime to employees who were due it, and this is further evidence the Defendants' misclassification of the Plaintiffs was not done in good faith. The Plaintiffs rely on three separate instances of conduct to support this argument. First, they contend that the Defendants

ordered hourly employees to work off the clock—to punch out but continue working. Second, they argue that Defendants ordered their accountant to not pay overtime to an employee for any fraction of the first hour over 40 in a week. And third, they rely on an email authored by the Defendants' daughter stating that Patel did not want to pay overtime for time spent in meetings.

The evidence on the first point showed that there were instances when Defendants instructed employees to work off the clock. Specifically, Damien Gilbertson, an opt-in Plaintiff who worked for the Defendants as an executive manager and a general manager, testified that it was a "regular practice" to have employees work off the clock. Clerk's Doc. No. 162, 222:5–8. According to his testimony, Jaymini Amin and Patti Tomasek both told Gilbertson that the Defendants did not want to pay overtime and if employees could not complete their tasks within their scheduled hours, they should finish the work off the clock. *Id.* at 223:3–16. Gilbertson recounted one instance in which an employee named Eric Boone was instructed by Defendants to clock out but keep working. Gilbertson, who was supervising the store that night, directed Boone to remain on the clock, yet when payday came, the Defendants did not pay Boone overtime. *Id.* at 225:13–24.

On the second point, Plaintiffs rely on the testimony of Jody Herrera, who was M. Patel Enterprises' bookkeeper from the spring of 2005 until April of 2010. Clerk's Doc. No. 173, 48:23–49:1. She testified that the Defendants paid overtime to executive managers from the fall of 2007 until the middle of 2008. *Id.* 49:8–15. She said that Mr. Patel told her how to calculate the payments and to classify the payments as overtime. *Id.* 49:8–50:23. She also testified that she heard the Defendants discuss their desire to move hourly employees to salary status so they could work more hours without Defendants having to pay them overtime. *Id.* 55:7–56:11. She also testified that Mr. Patel told her not to pay employees for overtime hours. *Id.* 58:18–21. In particular, Mr. Patel

14

told her that if an employee worked between 40 and 41 hours, she should not pay the employee overtime for the fraction of an hour over 40. *Id.* 59:2–24. Further, Mr. Patel told her that if an employee worked more than five hours in a day and did not punch out for a break or lunch, she should deduct 30 minutes from their clocked time because the employees were instructed to take a break when they worked more than five hours, and thus Herrera should assume the employee took a lunch break without punching out. *Id.* 60:13–18.

Finally, Plaintiffs offered in evidence an email from the Defendants' daughter, Anisa, which also expressed the Defendants' propensity to avoid paying overtime. She wrote an email to Tomasek that said Patel "had informed [Anisa] that we pay employees to attend meetings, but if they go into overtime we don't pay for them for overtime." Clerk's Doc. No. 164, 60:5–17.

The Court finds that Defendants were clearly disinclined to pay employees overtime. By itself, this does not necessarily mean that the Defendants were not acting in good faith. Indeed, one of the original goals of the FLSA was to use an employer's natural reluctance to pay overtime as a means to encourage employers to employ more workers—rather than having one employee work 70 hours in a week, 30 of which the employer would have to compensate the employee for at time-and-a-half wages, the FLSA gave the employer an incentive to hire a second employee, and have each of the two work less than 40 hours, keeping the wages at the regular rate for all 70 of the hours. Here, the overtime pay apparently had a different effect at times. Rather than hiring additional employees, the evidence suggests the Defendants sometimes skirted the edges—and at times crossed

the boundaries—of the overtime regulations. This evidence also undercuts the Defendants' argument that they acted in good faith.[6]

After considering all of the evidence, the Court concludes that the Defendants have failed to demonstrate that their failure to properly classify the Plaintiffs as non-exempt employees was the result of a good faith attempt to comply with the overtime laws. Accordingly, the Court finds that Plaintiffs are entitled to liquidated damages in an amount equal to their actual damages.

### IV. CONCLUSION

The proper method to compensate the Plaintiffs for the overtime they are due is described in detail in Section II. The Plaintiffs are directed to prepare a calculation of actual damages using the model provided by the Court, and then to meet and confer with the Defendants regarding the calculations. No later than February 8, 2012, the Plaintiffs shall file the calculations, broken down by plaintiff, along with a statement regarding whether the Defendants are in agreement that the calculations are mathematically accurate.[7] The Court will then enter judgment consistent with the

---

[6]The Plaintiffs also elicited evidence at trial regarding a document the Defendants provided to all new employees. The document was titled "Rules Governing Conduct," and among other things, it included a prohibition against discussing pay with other employees and against forming unions. The Plaintiffs suggested that both of these prohibitions violate federal labor laws. Specifically, 29 U.S.C. § 157 grants employees "the right to self-organization, to form, join, or assist labor organizations," and the NLRB and several courts have interpreted the section as also prohibiting employers from forcing employees to remain silent about their wages. *E.g.*, *N.L.R.B. v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 537–38 (6th Cir. 2000). Although the Patels testified that they never enforced the rules, Clerk's Doc. No. 164, 35:22–45:12, this is additional evidence suggesting that the Patels did not exercise good faith in remaining aware of federal labor laws.

[7]The only issue at this point is correctly doing the math called for by this order, and the Court does not anticipate there can be any dispute on that issue. Nevertheless, in the event there is a dispute, Defendants shall file a brief by February 8, 2012, stating their disagreement.

jury's verdict and the findings set forth herein. After judgment is entered, the Plaintiffs shall file a motion for attorneys' fees in the manner called for in FED. R. CIV. P. 54(d)(2) and Local Rule CV7(i).

SIGNED this 25th day of January, 2012.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE