IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ABIGAIL F. RANSOM, | § | |
| BONNIE KURZ, | § | |
| LORI A. HOPMANN, | § | |
| VERNON K. HENNEMAN, JR., | § | |
| DANIEL W. OWINGS, | § | |
| STEPHEN GILBERTSON, | § | |
| DAMIEN GILBERTSON, | § | CIVIL ACTION NO. |
| JOCELYN GUZMAN, | § | A-10-CA-857-AWA |
| CRYSTAL WATERS, | § | |
| JESSICA MOSELY, | § | |
| CHAD LATOSZEWSKI, | § | |
| PAULA ASHLEY BOSQUEZ, | § | |
| JOSHUA D. MCFADDEN, | § | |
| STEPHANIE A. HERRINGTON, | § | |
| LESLIE TOUCHET, and | § | |
| SHANNON PERRY, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| M. PATEL ENTERPRISES, INC., d/b/a PARTY CITY, | § | |
| MITESH M. PATEL, and | § | |
| JAYMINI AMIN, | § | |
| Defendants | § | |

## DEFENDANTS' OBJECTION TO PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES

COME NOW, DEFENDANTS, and file this their Objection to Plaintiffs' Request for

Attorneys' Fees, and in support thereof would show as follows:

## I. ARGUMENT & AUTHORITY

### A) INTRODUCTION.

1.      The Fifth Circuit in *Saizan v. Delta Concrete* confirmed the Supreme Court's

pronouncement in *Hensley v. Eckerhart*:

> "The most critical factor in determining an attorney's fee award is the 'degree of success obtained.'[1]  Prevailing party status 'may say little about

---

[1] *Saizan v. Delta Concrete Products Co.*, 448 F.3d 795, 799 (5th Cir. 2006) (quoting *Singer v. City of*

whether the expenditure of counsel's time was reasonable in relation to the success achieved.[²]'"

Here, Plaintiffs expended $362,000.00 in fees,[3] to recover $67,518.13 in unpaid wages. Even after including liquidated damages, which brings the total award to $135,036.25, the expenditure of time was unreasonable.

2.      And as detailed below, Plaintiffs were relatively unsuccessful. Specifically, they recovered only 36 percent of the amount they sought, due exclusively to the failure of two legal theories: (a) Their argument against application of the fluctuating workweek method, and (b) their failure to establish that the misclassification was willful. As detailed below, the Fifth Circuit in *Saizan v. Delta Concrete* reduced a fee award for these same reasons; reducing the fee proportionately based on the difference between the wages sought and the amount awarded.

3.      This Objection will also detail other reasons the fee should be reduced. For example, Plaintiffs argued against use of the fluctuating workweek method in bad faith. Specifically, they admitted in their Court-ordered offer letter to an amount of damages that equates the amount calculated under the fluctuating workweek method. And yet, Plaintiffs expended a stunning amount of time and effort arguing against the fluctuating workweek method. Indeed, Defendants would have revealed the letter's tacit admission earlier, but the Court's scheduling order required that "[a]ll offers of settlement are to be private, not filed, *and the Court is not to be advised of the same*" until an application is made for an award of fees.[4] As detailed in *Saizan*, simply losing on the damage calculation methodology justifies a proportional reduction in fees. But when a methodology is advanced in bad faith, the justification is strengthened.

---

*Waco, Tex.*, 324 F.3d 813, 829 (5th Cir. 2003)(quoting *Hensley v. Eckerhart*, 103 S.Ct. 1933 (1983) ).
[2] *Id.* (quoting *Hensley*, 103 S.Ct. 1933).
[3] *See* p.9 of Mot. for Fees (Doc.181) (describing fees expended prior to reduction to $324,000.00 due to billing judgment).
[4] *See* p.1 of Sched. Order (Doc. 26).

## B) LACK OF RELATIVE SUCCESS.

4.      Again, *Saizan* confirmed the Supreme Court's pronouncement in *Hensley v. Eckerhart*: "The most critical factor in determining an attorney's fee award is the 'degree of success obtained.' "[5] Stated similarly, " '[w]ork on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result obtained.' "[6] It is only when an attorney " 'has obtained excellent results, [that he] should recover a fully compensatory fees.' "[7]

5.      One court articulated the rationale of evaluating the degree of success: "If we were to award plaintiffs' attorney this amount, *we would be encouraging overpreparation and overextension for cases that easily are pursued as a vehicle for generating fees.*"[8] Another court similarly described the dangers of a disproportionate fee as "creat[ing] a perverse incentive . . . for the lawyers to pursue their own interests . . ."[9]

6.      Plaintiffs' Motion contends they "recovered much of the unpaid wages they were seeking."[10] Also, their lawyer contends in his affidavit that "the Plaintiffs largely succeeded on their claims against the Defendants."[11] This is untrue:  Plaintiffs recovered only 36 percent of the wages they sought.  As the Fifth Circuit did in *Saizan v. Delta Concrete* – and as detailed below – Plaintiffs fees should be reduced at least to $117,308.70 – 36 percent of the  $325,857.50 they seek.

### i.  Damages Sought v. Damages Awarded.

7.      In their Motion for Summary Judgment (Doc. 83) as well as a post-trial brief (Doc.

---

[5] *Saizan v. Delta Concrete Products Co.*, 448 F.3d 795, 799 (5th Cir. 2006) (quoting *Singer v. City of Waco, Tex.*, 324 F.3d 813, 829 (5th Cir. 2003) (quoting *Hensley v. Eckerhart*, 103 S.Ct. 1933 (1983) ).
[6] *Bowers v. Foto-Wear, Inc.*, 2007 WL 4086339, 4 (M.D.Pa., 2007) (quoting *Hensley v. Excherhart*, 103 S.Ct. 1933, 1939-1940 (1983) ).
[7] *Hernandez v. Hill Country Telephone Co-op., Inc.*, 849 F.2d 139, 144 (5th Cir. 1988) (quoting *Hensley v. Eckerhart*, 103 S.Ct. 1933, 1940 (1983)).
[8] *Hoffman v. S. Garber, Inc.*, 1993 WL 189623, 4 (N.D.Ill., 1993) (unpublished opinion).
[9] *Int'l Brotherhood of Carpenters and Joiners of America v. G.E. Chen Construction, Inc.*, 136 Fed.Appx. 36, 39-40 (9th Cir. 2005) (concurring opinion).
[10] *See* p.3 of Mot. for Fees (Doc. 181).
[11]

F:\Clients\19000 B-19301-1-19599-02\19512-07 M. Patel Enterprises. Inc-US District Court Law Suit\REQUEST FOR ATTYS FEES - RESPONSE - JMW.docx

169), Plaintiffs vigorously argued *against* application of the fluctuating workweek method for calculating overtime, the method used by the Fifth Circuit, six other Circuit Courts, and the U.S. Supreme Court in *Missel*.[12]  Using this non-standard methodology, Plaintiffs tendered a damage calculation model as Plaintiffs' Exhibit P-1, claiming they were owed $184,219.43 unpaid overtime and minimum wages.[13]  A copy is attached as Exhibit B.[14]  Taking into account their request for liquidated damages, Plaintiffs sought total damages of $368,438.86, twice the unpaid wage calculation.

8.     The Court ultimately rejected this calculation following extensive pre- and post-trial briefing, applying a methodology based primarily on the fluctuating workweek method.[15]  As a result, the Court awarded only $135,036.25 in unpaid wages and liquidated damages, compared to the $368,438.86 originally sought.  So, Plaintiffs were awarded only 36 percent of what they claimed they were entitled to – hardly a "recover[y] [of] much of the unpaid wages they were seeking."[16]

### ii.  *Saizan v. Delta Concrete Supports Proportional Reduction.*

9.     The Fifth Circuit in *Saizan* upheld a reduced fee award based on the same lack of success.[17]  Specifically, plaintiffs sought unpaid overtime using the same methodology urged by

---

[12] See *Overnight Motor Transp. Co. v. Missel*, 62 S.Ct. 1216, 1221 (1942);  *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 356-357 (4th Cir. 2011); *Urnikis-Negro v. American Family Property Services*, 616 F.3d 665, 673 (7th Cir. 2010); *Clements v. Serco, Inc.*, 530 F.3d 1224, 1230 (10th Cir. 2008); *Valerio v. Putman Assocs., Inc.*, 173 F.3d 35, 39-40 (1st Cir. 1999); *Fegley v. Higgins*, 19 F.3d 1126, 1130 (6th Cir. 1994); *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138 (5th Cir. 1988); *also see Smith v. Frac Tech Services, LLC*, 2011 WL 96868, 35 (E.D.Ark., 2011, *no writ*) (citing *Yellow Transit Freightlines, Inc. v. Balven*, 320 F.2d 495, 499-500 (8th Cir.1963) (holding that overtime should have been calculated by one-half rather than one and one-half the regular rate for an employee who was misclassified) ).

[13] See Exh. B; *see also* Welch Affd. at Exh. A (authenticating exhibit).

[14] Note that Plaintiffs ultimately substituted a different spreadsheet as Exhibit P-1 that lacked a damage calculation, after Defendants' objection to the original.   However, the original exhibit is the most accurate representation of damages Plaintiffs' were seeking prior to trial.

[15] See Memorandum Opinion & Order (Doc. 177).

[16] See p.3 of Mot. for Fees (Doc. 181).

[17] *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 798 (5th Cir. 2006).

Plaintiffs here, as opposed to the fluctuating workweek method urged by the defendant.[18]  The

damages under the competing methodologies was $156,000.00 and $15,619.00, respectively.[19]

Plaintiff sought a fee award of $114,057.00, which the district court reduced to $13,000.00.[20]

       10.     The Fifth Circuit upheld the reduction, noting two of the identical failures Plaintiffs

experienced here:

> "Plaintiffs failed to convince the court . . . that the fluctuating workweek
> method of calculating the amount of overtime compensation did not apply,
> [and] that [defendant] willfully violated the wage and hour law."[21]

The district court described the first as "the plaintiffs' failure to prevail on the *key issue* supporting

the claim for monetary relief – *method of calculation of overtime . . .*"[22]  Here, damage calculation

was similarly Plaintiffs' "key issue supporting their claim for monetary relief," since they sought

damages solely under the FLSA.

       11.     Regarding Plaintiffs' failure here to prevail on the "willfulness" issue, this

completely foreclosed recovery for two of the 16 Plaintiffs – Ms. Touchet and Mr. McFadden – and

reduced the recovery of a third, Mr. Owings.

       12.     In ***Saizan***, the district court "reduced the award of attorney's fees *in proportion to*

the difference between the initial prayer and the ultimate settlement amount," resulting in roughly a

90 percent reduction.[23]  Using the same proportional reduction here, Plaintiffs should receive only

$117,308.70 – 36 percent of the  $325,857.50 they seek.

### iii.  Lack of Success on Legal Issue Justifies Proportional Reduction.

       13.     Plaintiffs are correct that the Fifth Circuit has declined to adopt a rule *requiring*

---

[18] ***Saizan v. Delta Concrete Products Co., Inc.***, 448 F.3d 795, 798 (5th Cir. 2006).
[19] ***Id.***
[20] ***Id.*** at 799.
[21] ***Id.*** at 801.
[22] ***Id.*** at 800-801.
[23] ***Id.*** at 801-802 (noting proportional reduction) and 798-799 (noting overtime calculation methodology,
settlement amount, and amount of reduction in fees).

proportionality between damages and attorney's fees.[24]  However, this is much different than saying

a proportional reduction in fees is improper.  On the contrary, the Fifth Circuit in **Hernandez v. Hill**

**Country Telephone** said "'[a]lbeit not dispositive, *proportionality is an appropriate consideration*

*in the typical case.*'"[25]  **Saizan** confirmed this, noting that "[i]t remains true that there is no *per se*

proportionality rule," but then went on to uphold a proportional reduction in fees as being "well

within [the District Court's] purview."[26]  In doing so, it cited the Supreme Court and Fifth Circuit's

repeated holding that " 'the amount of damages a plaintiff recovers is certainly relevant to the

amount of attorney's fees to be awarded.' "[27]

14.    And while the amount of damages "alone should not lead the court to reduce a fee

award,"[28] here, the low amount is an indication of a lack of *legal* success.  That is, Plaintiffs'

unsuccessful pursuit of two legal theories – *i.e.* a non-fluctuating workweek methodology for

calculating overtime, and the allegation of willfulness – caused the lack of monetary success.

Indeed, this is how **Saizan** characterized the identical lack of success in that case, describing it as a

"failure to prevail on the *key issue* supporting the claim for monetary relief" – *i.e.* it was the failure

of legal issues, as opposed to an inability to persuade the trier of fact to award a particular number.

### *iv.  Other FLSA Cases Reducing Fee Awards Due to Unsuccessful Damage Theories.*

15.    **Saizan** is not the first time courts have reduced fee awards in FLSA cases based on

unsuccessful damage theories.  Indeed, case law from across the country is replete with examples of

similar reductions.[29]  As an example, in **Singer v. City of Waco**, the Fifth Circuit upheld the trial

---

[24] *See* p.2 of Motion (Doc. 181) (citing **Saizan**, 448 F.3d at 803).
[25] **West v. Nabors Drilling USA, Inc.**, 330 F.3d 379, 395 (5th Cir. 2003) (quoting **Hernandez v. Hill Country Tel. Co-op.**, 849 F.2d 139, 144 (5th Cir. 1988) ).
[26] **Saizan**, 448 F.3d at 802-803.
[27] **Saizan**, 448 F.3d at 802, fn.42 (quoting **City of Riverside v. Rivera**, 106 S.Ct. 2686 (1986) from **West v. Nabors Drilling USA, Inc.**, 330 F.3d 379, 395 (5th Cir. 1988)).
[28] **Saizan**, 448 F.3d at 799.
[29] *E.g.* **Singer v. City of Waco, Tex.**, 324 F.3d 813, 829-830 (5th Cir. 2003) (upholding trial court's

court's determination that the difference in the amount sought and amount awarded - $5 million and $180,000.00 – " 'weigh[ed] in favor of a downward adjustment.' "[30] The difference was caused by a number of unsuccessful legal theories urged by plaintiffs. First, the trial court allowed defendants an offset for overpayments of overtime wages in some pay periods against underpayments in other periods.[31] The difference in damages awarded versus those sought was "largely because of the offset."[32] Second, plaintiffs argued that the "regular rate" of pay used for overtime calculation should have been calculated using 40 hours in the denominator, as opposed to all hours worked in a given week.[33] <u>This is the identical theory Plaintiffs advanced in this case,[34] and which the Court rejected.[35]</u>

16.    Citing *Singer*, a federal district court from South Carolina reduced a fee award by a third because "plaintiffs' counsel achieved an award of slightly less than 10% of the total amount

---

reduction in fee based on difference in the amount sought and amount awarded - $5 million and $180,000.00 – " 'weigh[ed] in favor of a downward adjustment.' "); *Spegeon v. Catholic Bishop of Chicago*, 175 F.3d 544, 558 (7th Cir. 1999) (reducing fee by 50 percent due to recovery of $1,100.00 in back pay on a $1,781.25 claim); *International Brotherhood of Carpenters and Joiners of America, AFL-CIO, Local Union No. 217 v. G.E. Chen Construction, Inc.,* 136 Fed.Appx. 36, 39 (9th Cir. 2005) (upholding 67 percent reduction where plaintiff recovered $47,993.48 after initially seeking $6.7 million); *Hilton v. Executive Self Storage Associates, Inc.,* 2009 WL 1750121, 13-16 (S.D.Tex., 2009) (unpublished opinion) (reducing fee by 67 percent where plaintiff recovered less than 1 percent of the amount sought); *Barfield v. New York City Health and Hospitals Corp.,* 537 F.3d 132, 151-152 (2nd Cir. 2008) (reducing fee by 50 percent due recovery of small fraction of amount sought); *Harrison-Belk v. Rockhaven Community Care Home,* 2008 WL 2952442, 3-4 (D.S.C., 2008) (unpublished opinion) (reducing fee by 33 percent because "plaintiffs' counsel achieved an award of slightly less than 10% of the total amount his clients sought in back pay from defendants"); *Powell v. Carey Int'l, Inc.,* 547 F.Supp.2d 1281, 1296 (S.D.Fla. 2008), (reducing fee by 67 percent because the plaintiffs settled for a total of $294,140 after initially seeking more than $15 million in damages); *Wales v. Jack M. Berry, Inc.,* 192 F.Supp.2d 1313, 1326-1328 (M.D.Fla. 2001) (reducing fee by 67 percent because plaintiffs recovered less than 15 percent of the damages originally claimed); and *Hoffman v. S. Garber, Inc.,* 1993 WL 189623, 4 (N.D.Ill. June 2, 1993) (reducing fee by 41 percent, reflecting the percentage difference between the originally sought and the result obtained).
[30] *Singer v. City of Waco, Tex.,* 324 F.3d 813, 829-830 (5th Cir. 2003). Note that the trial court did not actually adjust attorneys' fees downward. Rather, it decided to deny an upward adjustment in fees justified by other factors, because of the downward adjustment justified by the lack of success in the monetary amount – *i.e.* the upward and downward adjustments cancelled each other out.
[31] *Id.* at 826-828.
[32] *Id.* at fn.11.
[33] *Singer,* 324 F.3d at 823-824.
[34] *See* p.3 of Plas' Mot. for Partial Summ. Jgmt. (Doc. 83)
[35] *See* pp.3-4 of Court's Memo. (Doc. 177).

his clients sought in back pay from defendants;" specifically, counsel sought $55,212.00 and was only awarded $5,223.16.[36] The court reasoned,

> "[b]ecause the amounts awarded to Plaintiffs were significantly less than both the amount of back wages and the fees sought by counsel, the court has determined that a downward adjustment is necessary to produce a reasonable result."[37]

It also quoted the Supreme Court's opinion in *Hensley v. Echerhart*:

> " 'If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.' "[38]

### C) PLAINTIFFS ARGUED AGAINST FLUCTUATING WORKWEEK METHOD IN BAD FAITH.

17.     As illustrated below, Plaintiffs have always considered the fluctuating workweek method proper, and their advocacy against it – both through a motion for summary judgment and in their post-trial brief – makes their fee request that much more unreasonable.  Specifically, in their court ordered settlement offer, Plaintiffs' counsel calculated damages using the fluctuating workweek method.  They did so because, just weeks prior, they had testified in their depositions that their salary was intended to cover all hours worked in a week – the touchstone for determining whether the fluctuating workweek is appropriate.

18.     Plaintiffs' later advocacy against the fluctuating workweek method was made in bad faith, and as detailed below, Plaintiffs spent roughly $320,000.00 in fees *after* the offer to obtain an additional recovery of $27,000.00 in lost wages.  Again, awarding fees for this relative lack of

---

[36] *Harrison-Belk v. Rockhaven Community Care Home*, 2008 WL 2952442, 3-4 (D.S.C., 2008) (unpublished opinion).
[37] *Id.* at 3.
[38] *Id.* at 3 (quoting *Hensley v. Echerhart*, 103 S.Ct. 1933, 1941 (1983) ) (emphasis added).

success ignores the rationale for evaluating the degree of success:

> "If we were to award plaintiffs' attorney this amount, *we would be encouraging overpreparation and overextension for cases that easily are pursued as a vehicle for generating fees.*"[39]

This is especially true when the fees were expended pursuing a damage calculation Plaintiffs knew was not viable.

### i.  Plaintiffs Considered Fluctuating Workweek Method Proper.

19.     The Court's Scheduling Order required the parties to exchange settlement offers and retain the offers for use "in assessing attorney's fees and court costs at the conclusion of trial."[40]  A copy of Plaintiffs' offer is attached as Exhibit C.  The letter includes Plaintiffs' calculation of unpaid minimum wages and overtime:

> "Based on the documents your clients have produced, with respect to the plaintiffs who are currently in the case, there is, by my calculations, approximately *$40,561.37* in unpaid minimum wages and overtime compensation at issue."[41]

The $40,561.37 was almost certainly calculated using the fluctuating workweek method *because it is almost identical to unpaid overtime and minimum wages calculated by Defendants in their post-trial brief in support of the method.*  Defendants' calculation – resulting in $42,797.04 – is detailed in their spreadsheet as Exhibit E to their post-trial brief to the Court (Doc. 168).[42]

20.     What can be said with certainty is that Plaintiffs' calculation was *not* based on the methodology they later advocated to the court, since it sought $184,219.43 [43] - *i.e.* the disparity is too great to confuse the two.  Nor could it have been based on the hybrid methodology the Court has

---

[39] *Hoffman v. S. Garber, Inc.*, 1993 WL 189623, 4 (N.D.Ill., 1993) (unpublished opinion); *also see Int'l Brotherhood of Carpenters and Joiners of America v. G.E. Chen Construction, Inc.*, 136 Fed.Appx. 36, 39-40 (9th Cir. 2005) (concurring opinion) (describing dangers of a disproportionate fee as "creat[ing] a perverse incentive . . . for the lawyers to pursue their own interests . . .").
[40] *See* p.2 of Order (Doc. 26).
[41] *See* p.2 of Exh. C.
[42] *See* p.016300 of Exh. D appended to Doc. 168.
[43] *See* Exh. B; *see also* Welch Affd. at Exh. A (authenticating exhibit).

adopted, because (a) that methodology was a unique creation of the Court in January 2012, nine months *after* Plaintiffs' offer, [44] and (b) the Court's methodology resulted in $67,518.13 in unpaid wages, a much higher number.

21.      Note that Plaintiffs' letter does complain of incomplete information, noting they lack payroll information for Ms. Touchet and Ms. Perry, as well as "slightly incomplete information for Vernon Henneman."[45]  However, this information would not have sufficiently altered their $40,561.37 calculation to distinguish it from the fluctuating workweek method.  Specifically, using the fluctuating workweek method, Ms. Touchet's and Ms. Perry's unpaid wages were $437.33 and $828.76, respectively, which would have *increased* the calculation to $41,827.46.[46]  Indeed, this makes it even more comparable to the fluctuating workweek calculation.[47]  It is unknown what information Plaintiffs lacked for Mr. Henneman, but the letter's allegation that his payroll records were "slightly incomplete" indicates it similarly would have altered the calculation very little.

22.      Plaintiffs' letter also notes their calculation is based on "plaintiffs who are currently in the case."[48]  However, no more plaintiffs joined the case after the April 22nd letter; the final plaintiff being Shannon Perry who joined on March 21, 2011.[49]  So, this would not have affected Plaintiffs' calculation.

23.      Again, for all these reasons, it is inescapable that Plaintiffs felt the fluctuating workweek method was the appropriate measure of unpaid wages.

---

[44] *See* Court's Memorandum (Doc. 177) (dictating hybrid methodology to calculate unpaid wages).
[45] *See* p.2 of Exh. C.
[46] *See* Touchet and Perry's calculations at p.016300 of Exh. D appended to Doc. 168.
[47] Note, it is not clear if Plaintiffs based their calculation on three or two years worth of unpaid wages; the difference being whether the misclassification was "willful," and the resulting change in the statute of limitations.  It seems logical that Plaintiffs' letter assumes willful misclassification, meaning their calculation is based on three years unpaid wages.  Therefore, this Objection compares Plaintiffs $40,561.37 calculation to Defendants' calculation of $42,797.04 based on three years wages (*see* calculation at p.016300 of Exh. D appended to Doc. 168).
[48] *See* p.2 of Exh. C.
[49] *See* Perry's Notice of Consent (Doc. 37).

### ii. *Plaintiffs Used Fluctuating Workweek Method With Full Knowledge of Compensation Agreement.*

24.     Both this Court and other federal appellate courts have held that the applicable

methodology "turns on what the parties agreed the employee would be paid for the hours he actually

worked."[50]   At the time of the April 22nd letter, Plaintiffs' lawyers already knew the terms of the

compensation agreement; hence, the letter's use of the fluctuating workweek method.   Specifically,

in late March 2011 – weeks prior to the letter – Defendants had deposed five of the Plaintiffs, and

all gave testimony similar to the following from Mr. Henneman:

> "Q:  The $480 a week that you were paid, was that
> supposed to be compensation for all hours you worked,
> regardless of whether you worked 55 or more?
>
> A:  That's the way I understood the salary position
> back from when I was at Linens 'n Things . . . because
> that's what the salaried managers would have to do. . .
> .
>
> Q:  And so you knew that here your salary was to cover
> all hours you worked no matter how many you worked?
>
> A:  Correct."[51]

Ms. Hopmann testified similarly:

> "Q:  My understanding is your minimum hours you were
> supposed to work as an executive manager was 55, right?
>
> A:  Yes.
>
> Q:  The salary of $673 a week was supposed to cover the
> time you worked regardless of whether it was 55, 65, or
> 75 hours, correct?
>
> A:  Yes."[52]

---

[50] *E.g. Urnikis-Negro v. American Family Property Services*, 616 F.3d 665, 680-681 (7th Cir. 2010); *see also* Court's Order on Summ. Jgmt. at p.14 (stating "[w]here there are enough facts from which to conclude that the parties actually had an understanding about how many hours the salary was intended to compensate, then those facts will determine the regular rate, and thus damages.")
[51] *See* pp.33-34 of Henneman Depo. at Exh. B of Mot. for Summ. Jgmt. (Doc. 84).
[52] *See* p.31 of Hopmann's Depo. at Exh. B of Mot. for Summ. Jgmt. (Doc. 84).

Excerpts from all five of the deposed Plaintiffs' depositions are attached as Exhibit B to Defendants' motion for summary judgment (Doc. 84).

25.     Plaintiffs' lawyer, Mr. Moreland, defended Plaintiffs at their depositions, so he was personally knowledgeable of their testimony regarding the compensation arrangement. Indeed, Mr. Moreland's billing records confirm that he reviewed the depositions when preparing the settlement offer using the fluctuating workweek method.  Specifically, from April 15th through April 22nd, Mr. Moreland's time entries show that he was "review[ing] and summariz[ing]" the depositions of three of the five deposed Plaintiffs, while simultaneously drafting the settlement offer.[53]

26.     Based on Plaintiffs' testimony, their lawyer appropriately used the fluctuating workweek method in their settlement offer.

27.     It is true that the Court reviewed this testimony in considering the Parties' cross-motions for summary judgment on damage calculation, and found it insufficient to establish the nature of the parties' agreement.[54]  But Plaintiffs' eventual trial testimony confirmed the deposition testimony, convincing the Court to adopt primarily the fluctuating workweek method.[55] Presumably, the two rulings can be reconciled because of the differing standards for granting a summary judgment versus that for ruling as a fact finder.  And, simply because the Court found the deposition testimony insufficient to grant summary judgment, does not mean Plaintiffs' lawyer did not have a full knowledge of the compensation arrangement directly from his clients.  The point is, again, that Plaintiffs have always known what the salary arrangement was, and yet wasted a stunning amount of resources arguing something different to the Court.

28.     Indeed, it was with a large amount of frustration that Defendants have been unable

---

[53] *See* p.36 of Exh. D.
[54] *See* Order on Summ. Jgmt. (Doc. 125).
[55] *See* ¶¶7-11 of Defs' Brief on Damage Calc. (Doc. 168) (summarizing trial testimony on agreement).

to use the April 22nd letter prior to this point to demonstrate Plaintiffs' tacit agreement with the fluctuating workweek method.  However, the Court's scheduling order expressly dictated that the settlement offers were "to be private, not filed, *and the Court is not to be advised of the same*," except for the purpose of "assessing attorney's fees and court costs at the conclusion of trial."[56] Now that the settlement offers are fair game, Defendants urge that the Court consider Plaintiffs' bad faith advocacy against the fluctuating workweek method in reducing their fee.

### iii.  *Increase in Attorneys' Fees Following Offer.*

29.      Plaintiffs' settlement offer estimated that as of April 22nd – the date of the letter – "attorney fees and costs are approximately $55,000.00."[57]  According to their motion for attorneys' fees, they eventually incurred $362,000.00 in fees.[58]  So, Plaintiffs spent roughly an additional $312,000.00 in order to pursue a damage calculation they did not think was appropriate, and which was ultimately denied.  Indeed, all their effort resulted in recovery of only $27,000.00 more than their original estimate; and only then because the Court has used a hybrid as opposed to a pure fluctuating workweek methodology.  Again, awarding them these fees without some reduction will violate the rationale of evaluating an attorneys' success by "*encouraging overpreparation and overextension for cases that easily are pursued as a vehicle for generating fees.*"[59]

### D)  *JOHNSON* FACTORS.

30.      Regarding the 12 *Johnson* factors:  " 'Of the Johnson factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the results

---

[56] *See* p.1 of Order (Doc. 26).
[57] *See* p.2 of Exh. C (emphasis original).
[58] *See* p.9 of Mot. for Fees (Doc.181) (describing fees expended prior to reduction to $324,000.00 due to billing judgment).
[59] *Hoffman v. S. Garber, Inc.*, 1993 WL 189623, 4 (N.D.Ill., 1993) (unpublished opinion); *also see Int'l Brotherhood of Carpenters and Joiners of America v. G.E. Chen Construction, Inc.*, 136 Fed.Appx. 36, 39-40 (9th Cir. 2005) (concurring opinion) (describing dangers of a disproportionate fee as "creat[ing] a perverse incentive . . . for the lawyers to pursue their own interests . . .").

obtained, and the experience, reputation and ability of counsel.' "[60]  The court should also consider "awards in similar cases."[61]  These are addressed here.

### i.  *"The Amount Involved and the Results Obtained" and "Awards in Similar Cases."*

31.     Reading the Supreme Court's opinion in *Hensley v. Eckerhart*, these considerations appear to be same as those addressed above regarding Plaintiffs' lack of relative success.[62]  Indeed, when *Hensley* addressed them, it concluded "the most critical factor is the degree of success obtained" – the same quote used to begin Defendants' discussion of the issue above.[63]  Regarding awards in similar cases, Defendants have already cited other cases in which a proportionate reduction based on lack of success was appropriate; including *Saizan* which proportionately reduced a fee based on the same lack of success Plaintiffs experienced here.  Therefore, these arguments will not be repeated here.

### ii.  *Moreland's Hourly Rate Unreasonable:  Not a "Market Rate."*

32.     Mr. Moreland argues that his hourly charge of $325.00 is reasonable "in view of the current prevailing *market rate* for such services for attorneys with similar skills, experience, expertise and certification in the Austin, Texas area."[64]  It is not.

33.     The only parties in this case that obtained a true "market rate" were Defendants. Specifically, Defendants were required to negotiate their rate because their lawyers were paid by the hour.  This is contrasted with Plaintiffs' lawyers who were undoubtedly engaged on a contingency basis, and therefore no market rate was ever set.  Therefore, the $325.00 rate sought by Mr. Moreland is not a "market rate" at all, but rather his estimate of what he thinks his legal work is

---

[60] *Saizan*, 448 F.3d at 800 (quoting *Migis v. Pearle Vision*, 135 F.3d 1041, 1047 (5th Cir. 1998) ).
[61] *Id.* at fn. 18 (citing *Johnson*, 488 F.2d at 717-19.
[62] *See generally Hensley v. Echerhart*, 103 S.Ct. 1933, 1937-1941 (discussing factor and eventually describing it as
[63] *Id.* at 1941.
[64] *see* p.3 of Exh. A to Motion for Attys' Fees (Doc. 181).

worth.

34.     Defendants' counsel – Justin Welch and Julie Plowman – graduated from The University of Texas at the same time as Mr. Moreland.[65]  They charged Defendants $250.00 and $225.00 an hour, respectively.  This is their standard hourly rate.  And their experience is at least the equivalent, and in some areas arguably more extensive, than Mr. Moreland's.  Specifically, since graduation, Ms. Plowman has practiced primarily employment law, including four years as sole in-house counsel on employment law issues for Broadwing Communications, now known as Level 3, overseeing employment issues for roughly 2,500 employees.[66]  And for four years prior to that, she was sole in-house counsel on employment law issues for a division of Time Warner Telecom, formerly known as Xspedius Communications, overseeing employment issues for roughly 1,000 employees.

35.     Mr. Welch is an equity partner in Blazier, Christensen, Bigelow & Virr, P.C., and has practiced primarily commercial litigation since graduation, having handled at least 250 pieces of litigation, almost exclusively as lead counsel.  He has tried to judgment at least 24 of those cases – roughly half to a jury – and at least 80 percent as lead counsel.  Roughly 20 percent of his practice involves employment issues – typically noncompete and trade secret disputes – although one of his notable successes was a summary judgment for an employer in a federal racial discrimination case.[67]

36.     Geography also argues against Mr. Moreland's rate.  Specifically, Mr. Moreland cites the $389.00 *median* hourly rate of Ogletree, Deakins, Nash, Smoak & Steward, P.C., as justification for a rate of "$300 to $400 per hour," noting that Ogletree has "a presence in Austin,

---

[65] *See generally* Welch Affd. at Exh. A.
[66] *See* Plowman Affd. at Exh. F.
[67] *See* Summary Judgment Order (Docs. 18 and 21) in ***Clifford Thomas v. E.O. Sharp Butane Co., Inc., d/b/a Sharp Propane***; Cause No. 1:02-cv-00548-LY, Western District of Texas, Austin Division.

F:\Clients\19000 B-19301-1-19599-02\19512-07 M. Patel Enterprises, Inc-US District Court Law Suit\REQUEST FOR ATTYS FEES - RESPONSE - JMW.docx

Texas."[68]  Ogletree's "presence" is on the eleventh floor of a downtown Austin high-rise at 301

Congress.  Mr. Moreland, however, is located in a roughly 600 square foot, free-standing, frame

building in the rural town of Wimberley, Texas.   Presumably, Mr. Moreland's overhead is

significantly less than Ogletree's.  What constitutes a reasonable fee is not some abstract concept

divorced from an attorneys' overhead.  On the contrary, a lawyer's fee is supposed to be designed to

cover his overhead and provide him a reasonable salary commensurate with his skills and abilities.

Assuming for argument's sake that Mr. Moreland's skill level is comparable to Ogletree's lawyers,

using their rate as a basis for his award would grant him a windfall.

     37.     And, Defendants lawyers are located in a downtown high rise two blocks from the

federal courthouse, and so they have overhead much more similar to Ogletree's.  Based on that

overhead, as well as the experience of Mr. Welch and Mrs. Plowman, Defendants obtained a market

negotiated hourly rate of $250.00 and $225.00, respectively.

     38.     Furthermore, Mr. Moreland's skill level is arguably not comparable to the lawyers of

Ogletree.  According to U.S. News and World Report's, Ogletree was the 2011-2012 "Law Firm of

the Year" for labor and employment litigation issues.[69]  A search of the website at

http://bestlawfirms.usnews.com/search.aspx returned nothing for Mr. Moreland or his Firm.[70]

Regardless, it is Plaintiffs' burden to establish that their lawyers' skill level warrants Ogletree's

same rates as they claim it does.  However, they have tendered no evidence by which to make a

comparison.

     39.     Defendants ask that Mr. Moreland's billings that remain after deduction of other

items be reduced an additional 23 percent; the reduction necessary to reduce his $325.00 hourly rate

to $250.00.  So, for example, if the Court reduced fees by 64 percent – a proportionate decrease

---

[68] *See* ¶5 at p.2 of Moreland Affd. at Exh. A (Doc. 181).
[69] *See* printout at Exh. E.; *see also* Welch affidavit at Exhibit A authenticating same.
[70] *See* Welch Affd. at Exh. A.

based on their lack of monetary success detailed above – Mr. Moreland's fees would be $83,853.90. This is calculated as 36 percent of the current amount of $232,927.50 he seeks.[71] This $83,853.90 would be reduced by another 23 percent to reflect reduction to a reasonable hourly rate; or $64,567.50.

### E) "TELEPHONE CONFERENCES," "CONFERENCES" &" CORRESPONDENCE" LACK EXPLANATORY DETAIL.

40.     Plaintiffs' billing detail contains dozens of entries for "teleconferences," "conferences" and "correspondence" with no explanatory detail or even an indication of the topic discussed.  For example, on October 4, 2010, Mr. Moreland's complete time entry is "telephone conference with Steven Gilbertson."[72] As another example, on October 5, 2010, he had a "[t]elephone conference with Jody Herrera re facts."[73]  Indeed, some of the entries obviously contemplated more detail, but were truncated, such as this on October 16, 2010:  "Review file; telephone conference with Jody Herrera re."[74]  Which begs the question, "re" what?  And still other conferences are with individuals with no indication of who they are, such as this on December 7, 2010:  "Telephone conference with Kim Sheehan."[75]  Who is Kim Sheehan?

41.     Plaintiffs tacitly admit that some of this time is not reasonably recoverable, as noted by the reductions for "billing judgment" in the middle column at Exhibit D.  For example, Plaintiffs reduced the October 16, 2010, entry for 1.2 hours by half.  But this begs the question, why should it be reduced by only half?  The lack of explanatory detail leaves no way for Defendants or the Court to evaluate the activity, and makes Plaintiffs' lawyer the sole judge of the matter.

42.     In total, Plaintiffs are seeking $18,687.50 for time entries that include these

---

[71] *See* p.46 of billing detail at Exh. D.
[72] *See* p.32 of Billing Detail at Exh. D.
[73] Id.
[74] Id.
[75] Id. at p.33.

F:\Clients\19000 B-19301-1-19599-02\19512-07 M. Patel Enterprises, Inc-US District Court Law Suit\REQUEST FOR ATTYS FEES - RESPONSE - JMW.docx

conferences.  The time entries are marked as "1" on the billing detail at Exhibit D.[76]

43.  In 2010, this Court ruled on a request for attorneys fees in ***Klebe v. University of Texas Health Science Center***, and reduced the award for lack of subject matter description similar to that in Plaintiffs' records here:

> "In determining whether the amount of time expended on a matter is reasonable, courts are to review time records supplied by the movant and exclude from the lodestar calculation all time that is 'excessive, duplicative, or *inadequately documented.*' "[77]

> "In ***Leroy v. City of Houston***, 831 F.2d 576, 585 (5th Cir. 1987), the Fifth Circuit explained that billing records that *lack explanatory details* are unacceptable. In some respects, the billing records submitted in this case fit that description. In ***Hensley v. Eckerhart***, 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court noted that when requesting fees, counsel *should identify the general subject matter of time expenditures.* 'Where the documentation of hours is inadequate, the district court may reduce the award accordingly.' *Id.* at 433. As noted, Plaintiff's billing statements are lacking in details regarding the work done in each entry. While Dr. Klebe's counsel briefly describes the type of work being done, *he does not identify the subject matter of what was being worked on*, so it is impossible to determine what hours were actually spent on the retaliation claim or the damages related to that claim."[78]

44.  Here, Mr. Moreland has told us he had a conference with someone, but the subject matter of the conference is not described.  Without this, Mr. Moreland has become the sole arbiter of whether the work was reasonably necessary to pursue Plaintiffs' claims.

45.  Plaintiffs ask that Mr. Moreland's fees be reduced by $18,687.50, and that the reduction occur before any reduction to reflect a reasonable billing rate.

---

[76] It should be noted that in some situations, Plaintiffs failed to segregate a "conference" from other activities.  For example, on December 16, 2010, Mr. Moreland spent 4.5 hours on "[c]orrespondence with clients; revise declarations; prepare for and attend Rule 26(f) conference with Justin Welch."[76]  There is no way to separate the time spent on "correspondence" versus the other activities, so the entire amount was included in the total.

[77] ***Klebe v. Univ. of Tex. Health Science Center at San Antonio***, 2010 WL 1544394, 1 (W.D.Tex. 2010, *rev'd in part on other grounds*) (unpublished opinion) (quoting ***Mid-Continent Cas. Co. v. Chevron Pipe Line Co.***, 205 F.3d 222, 234 (5th Cir.2000) ).

[78] *Id.* at 4-5.

## F) REBUTTAL OF PLAINTIFFS' MISCELLANEOUS "SUCCESSES."

46.     Mr. Moreland contends Plaintiffs "were largely successful on nearly every procedural issue, including most motions they chose to file or oppose," and lists half a dozen items where Plaintiffs allegedly succeeded.[79]  However, most of these successes can be characterized as straw man defeats, or mischaracterizations of outcomes.  Indeed one of the items, the Parties cross-motions for summary judgment on damages calculation, resulted in Plaintiffs largest failure.

### i.  Decertification of Collective Class.

47.     Mr. Moreland claims "Plaintiff's succeeded in foreclosing any attempt to decertify this case."[80]  This assumes Defendants ever contemplated attempting to decertify the collective class.  This was not a case with potentially hundreds of plaintiffs in which decertification could minimize economic exposure or serve some other strategic goal.  On the contrary, it had only 16 plaintiffs, and there was a potential benefit in grouping the less experienced executive managers with those that were more competent and exercised more managerial duties.  Therefore, Plaintiffs did not even try to decertify the class.  Defeating straw men cannot be counted as a successes.

### ii.  Successful Certification of Collective Class.

48.     Mr. Moreland similarly claims success because "the Court granted Plaintiffs' Motion for Conditional Certification" of the collective class.[81]  But these motions are rarely denied, and are routinely upheld on the bare allegations regarding the existence of similarly situated plaintiffs.  Plaintiffs' motion for certification correctly referred to the evidentiary burden as "lenient," citing a case from Judge Nowlin's court certifying another collective class.[82]  Indeed, Defendants' response to the motion to certify noted in the first paragraph, "Defendants have chosen

---

[79] See pp.8-9 of Moreland Affd. at Exh. A of motion for fees (Doc. 181).

[80] Id.

[81] Id.

[82] See pp.2-3 of Motion for Certification (Doc. 15) (citing *Pedigo v. 3003 South Lamar LLP*, 666 F.Supp.2d 693, 697 (W.D.Tex. 2009) ).

F:\Clients\19000 B-19301-1-19599-02\19512-07 M. Patel Enterprises, Inc-US District Court Law Suit\REQUEST FOR ATTYS FEES - RESPONSE - JMW.docx

not to oppose the 'similarly situated' inquiry in this, the 'notice stage' of the proceedings, given the 'fairly lenient standard' used in the Court's analysis."[83] So, Mr. Moreland defeated yet another straw man.

49.    Moreover, Defendants' entire response was devoted to amending the heavily biased notice that Plaintiffs had proposed be sent to prospective plaintiffs, an effort in which Defendants were primarily successful.[84] Specifically, Defendants' proposed amendments were set forth in a redlined version of Plaintiffs' proposed notice at Exhibit B of the response (Doc. 17). Comparing the redlined version to Judge Nowlin's eventual notice reveals that the bulk of Defendants' changes were adopted.[85] This included deleting Plaintiffs' proposed instruction to prospective plaintiffs that they should call Plaintiffs' counsel with any questions, an instruction that would likely preclude a prospective plaintiff from obtaining both sides of the proverbial story. Indeed, Judge Nowlin included an instruction that prospective plaintiffs could direct questions to Defendants' counsel as well. Judge Nowlin also deleted a highly biased description of the case and included language portraying Defendants' defenses, something that was not part of Plaintiffs' proposed notice.

### *iii.  Cross-Motions for Summary Judgment on Damage Calculation.*

50.    Mr. Moreland similarly contends that Plaintiffs "were successful in opposing the Defendants' Motion for Summary Judgment regarding the very complicated issue of the proper calculation of damages . . . *and they succeeded in obtaining a well-reasoned order from the Court that is, as far as I know, the first of its kind in the United States.*"[86] Notwithstanding the self-ingratiating pandering, *it was this "well-reasoned order" that lead to Plaintiffs' biggest defeat.*

51.    Specifically, the Court's order telegraphed the testimony it wished to hear at trial in order to determine the appropriate methodology for calculating overtime:

---

[83] *See* p.2 of response to motion to certify (Doc. 17).
[84] *See generally* response to motion to certify (Doc. 17).
[85] *See* Notice at pp.8-11 of Nowlin's Order (Doc. 27).
[86] Id. at p.9.

> "Where there are enough facts from which to conclude that the parties actually had an understanding about how many hours the salary was intended to compensate, then those facts will determine the regular rate, and thus the damages."[87]

> "To the extent factual findings need to be made to make that determination, the Court will make those findings based on the evidence presented at trial."[88]

It was the testimony elucidated by Defendants at trial, at the behest of the Court, that resulted in the Court's hybrid methodology based primarily on the fluctuating workweek method; *thereby reducing Plaintiffs' recovery by 64 percent.*

52.     Moreover, Plaintiffs were not the only contributors to the Court's "well-reasoned order." Defendants' cross-motion for summary judgment similarly contributed, arguably more-so, since Defendants' motion, in combination with the post-trial briefing on the issue, convinced the Court to diverge from its prior *EZPawn* decision – the decision that Plaintiffs argued it should have followed.

53.     So, Plaintiffs did not successfully oppose Defendants' Motion for summary judgment. Rather, they failed to persuade the Court to follow its *EZPawn* decision, resulting in a loss of two-thirds of their damages.

### iv. *Cross-Motions for Summary Judgment on Liability.*

54.     Plaintiffs contend they "were also successful in opposing Defendants' lengthy, extensive and detailed Motion for Final Summary Judgment."[89] But Defendants were also successful in opposing Plaintiffs' equally lengthy cross-motion for summary judgment. So any of Plaintiffs' success was arguably a wash.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants pray that their Objection be well

---

[87] *See* Order (Doc. 125)  at pp. 8 and 14.
[88] Id. at p.17.
[89] *See* p.8 of Moreland Affd. at Exh. A of Doc. 181.

taken, and that the relief sought above be granted.

Respectfully submitted,

By:_____
Justin M. Welch
State Bar No. 24003876
Julie Plowman
State Bar No. 00797253

**members of the Firm of:**

**BLAZIER, CHRISTENSEN, BIGELOW
   & VIRR, P.C.**
ATTORNEYS & COUNSELORS AT LAW
221 West 6th Street, Suite 2000
Austin, Texas 78701
Telephone: 512-476-2622
Facsimile: 512-476-8685
Emails: jwelch@blazierlaw.com &
jplowman@blazierlaw.com

## CERTIFICATE OF SERVICE

The undersigned represents that a true and correct copy of the foregoing document was transmitted to those individuals set forth below pursuant to the Federal Rules of Civil Procedure on this the 13th day of _____MARCH_____, 2012, by electronic notification and/or in the manner so indicated.

Edmond S. Moreland, Jr.
Floreani & Moreland, L.L.P.
13500 Ranch Road 12, Suite E
Wimberly, Texas 78676
*Via ECM and regular mail*

_____
Justin M. Welch

F:\Clients\19000 B-19301-1-19599-02\19512-07 M. Patel Enterprises, Inc-US District Court Law Suit\REQUEST FOR ATTY'S FEES - RESPONSE - JMW.docx