```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION
 3  ABIGAIL F. RANSOM, BONNIE      *
    KURZ, LORI A. HOPMANN, VERNON  *
 4  K. HENNEMAN, JR., and DANIEL   *
    W. OWINGS, Individually and    *
 5  On Behalf of All Others        *
    Similarly Situated,            *
 6            Plaintiffs,          *   Civil Action No.
    v.                             *      A:10-CA-857-AWA
 7                                 *
    M. PATEL ENTERPRISES, INC.,    *   Jury Demanded
 8  M. PATEL ENTERPRISES, INC.     *
    d/b/a PARTY CITY, M. PATEL     *
 9  ENTERPRISES, INC. d/b/a PARTY  *
    PIG SUPERSTORE, MITESH M.      *
10  PATEL, and JAYMINI AMIN,       *   November 7, 2011
    a/k/a JAYMI PATEL,             *
11            Defendants.          *   Austin, Texas
12             EXCERPT OF TRANSCRIPT OF TRIAL
              THE OPENING STATEMENTS FOR BOTH
13                PLAINTIFFS AND DEFENDANTS
             BEFORE THE HONORABLE ANDREW AUSTIN
14              UNITED STATES MAGISTRATE JUDGE
                        AND A JURY
15
16  APPEARANCES:
    For the Plaintiffs:      Mr. Edmond S. Moreland, Jr.
17                           FLOREANI MORELAND, LLP
                             13500 Ranch Road 12, Suite E
18                           Wimberley, Texas 78676
19                           Mr. David Weiser
                             Mr. Adam Casner
20                           KATOR, PARKS & WEISER, PLLC
                             1609 Shoal Creek Blvd.
21                           Suite 201
                             Austin, Texas 78701
22
    For the Defendants:      Mr. Justin M. Welch
23                           BLAZIER, CHRISTENSEN, BIGELOW,
                             & VIRR, PC
24                           221 West 6th Street
                             Suite 2000
25                           Austin, Texas 78701
```

1   APPEARANCES(cont.):

2

    Court Reporter:        Paige S. Watts, CSR/RPR
3                          DEPUTY OFFICIAL COURT REPORTER
                           1016 La Posada Drive
4                          Suite 294
                           Austin, Texas 78752
5

           (Proceedings recorded by mechanical stenography,
6   transcript produced by computer)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Opening Statements)
 2               THE COURT:  Then I'll go ahead and
 3    recognize the Plaintiff for opening statement.
 4               MR. MORELAND:  Thank you, Your Honor.
 5               As I said during voir dire --
 6               THE COURT:  I'm sorry.  I'm going to
 7    interrupt you one more time.
 8               MR. MORELAND:  That's okay.
 9               THE COURT:  I'm going to limit the
10    attorneys to 20 minutes.  So if you see me cut them off,
11    that's why.
12               MR. MORELAND:  Thank you, Your Honor.
13               As I indicated during voir dire, this is
14    a case about fair pay for long hours.  The Plaintiffs in
15    this case were Executive Managers for the Defendants,
16    and they worked extremely long hours working for the
17    Defendants.  Oftentimes, over 55 hours in a week; but
18    sometimes up to 60, 70, 80, 90, sometimes over 100 hours
19    a week and they did so without any overtime payment and
20    for a set wage, a set amount per week in a wage, as a
21    wage.
22               And sometimes the Plaintiffs worked so
23    many hours during a week, that they actually fell below
24    the minimum wage on an hourly basis.  Sometimes they
25    worked for as little about $4.61 cents an hour.  Now, I
```

1  have -- let me show you the gravity of what we're

2  talking about here.  This is Plaintiffs' Exhibit 1 that

3  has been preadmitted by the Court, and this is a chart

4  showing the number of -- total number of hours that the

5  Plaintiffs worked as Executive Manager and then the

6  total number of overtime hours that the Plaintiffs

7  worked as Executive Managers.  And as you can see,

8  nearly one-third of their total hours spent working for

9  the Defendants as Executive Managers are overtime hours.

10             Now, at the close of this case, we will

11  be asking you to return a verdict for the Plaintiffs

12  that entitles them to overtime pay and entitles them to

13  the minimum wage.  And we will ask you to return a

14  verdict for the Plaintiffs that returns to them the

15  money they've already worked long hours for the

16  Defendants and have already earned.  That's all we're

17  asking for in this case.

18             Now, the Court has already held that it

19  will decide the amount of money in this case at the end

20  of the trial; so we're not going to be asking you for a

21  specific dollar amount.  But you, as Federal jurors, are

22  gatekeeper on whether or not the Plaintiffs are entitled

23  to the money that they've already earned and that's what

24  we'll be -- that's all we will be asking you for at the

25  end of this case.

1          Now, the Defendants claim that they don't

2   owe my clients anything.  They claim that my clients

3   were executives, exempt from the protections of the

4   Overtime Act, and that they were Executive Managers.

5   Now, don't be fooled.  The Plaintiffs were managers at

6   the Defendants' convenience.  They were managers at the

7   Defendants' convenience, and managers largely in name

8   only.  Now, the Plaintiffs have the burden to prove

9   certain facts as the Judge discussed with you earlier

10  today and among those facts is that the Defendants are

11  engaged in commerce and that they employed two or more

12  people and that they earned more than $500,000 in gross

13  receipts over the time period that we're asking for the

14  Court or for the jury to award minimum wages and

15  overtime pay.

16          Now, the Defendants have the burden to

17  prove to you that the Plaintiffs were executives, exempt

18  from the protections of the Fair Labor Standards Act and

19  not entitled to overtime and not even entitled to a

20  minimum wage.  That's the Defendants' burden.  Now,

21  despite the fact that that's the Defendants' burden, the

22  Plaintiffs' testimony, the Plaintiffs' evidence will

23  prove that, in fact, the Plaintiffs were managers

24  largely in name only and that they were managers at the

25  Defendants' convenience.

1          Now, before I talk to you a little bit

2   about the tasks that I believe you'll hear testimony on

3   here over the next few days, I want to put into context

4   where my clients fall in the Defendants' operation.  And

5   I've never received an organizational chart from the

6   Defendants in this case; so over the weekend, I kind of

7   had this one drawn up for me and so if I could just run

8   through this very quickly.  You'll hear testimony on

9   this.  What I say is not evidence, but you'll hear

10  testimony on this.  I've done an organizational chart

11  here so you can see where the Executive Managers, the

12  Plaintiffs in the case, fall into their organization.

13          At the apex of the company, we have the

14  two individual Defendants, Mr. Mitesh Patel and Jaymini

15  Amin.  Reporting directly to the owners is the District

16  Manager, who is responsible -- there's a single District

17  Manager responsible for all three of the Defendants'

18  stores.  And at the store level, each store has a

19  General Manager and the General Manager is ultimately

20  responsible for the store.  And reporting to the General

21  Manager is the Executive Manager and there are two,

22  three, four Executive Managers per store and the

23  Executive Manager reports directly to the General

24  Manager.

25          Now, everyone from the Executive Manager

1  all the way up to the District Manager, they are

2  salaried employees.  None of these folks is entitled to

3  overtime.  The Plaintiffs here, of course, are again the

4  Executive Managers.  They are the lowest level salaried

5  employee and they were entitled to overtime and did not

6  receive it.  But reporting to the Executive Manager is

7  an Assistant Manager position.  That is an hourly

8  position, and you'll hear testimony that these folks did

9  largely what the Executive Manager did.

10             Reporting to the Assistant Manager is a

11  Front-end Manager or a Receiver.  They're sort of on a

12  level -- they're sort of the same reporting level.

13  You'll hear the Receiver referred to sometimes as a

14  Receiving Manager.  Again, Front-end Manager and

15  Receiver also hourly employees.  You'll also hear

16  testimony that one of the Plaintiffs, Vernon Henneman,

17  operated as a Receiver, an hourly Receiver.

18             The lowest level employee in the

19  Defendants' system is the Associate.  This is also an

20  hourly position.  So Associate up to Assistant Manager,

21  hourly.  Executive Manager through District Manager,

22  salaried.  Now, you have an idea of where my Plaintiffs,

23  where my clients fit into the Defendants' operations.

24  Now, again, despite of the fact that the Defendants have

25  the burden of proof to prove to you that the Plaintiffs

1  were executives -- that's what they're going to try to

2  convince you -- the Plaintiffs' testimony, the

3  Plaintiffs' evidence will prove that, in fact, they were

4  not executives.  They were managers largely in name

5  only, and managers at the Defendants' convenience.

6           You'll hear evidence that the Plaintiffs

7  spent 80, 85, 90, 95 percent of their time doing

8  non-management work, non-management work.  And you'll

9  hear about those non-management tasks that all the

10 Plaintiffs did, that all the Plaintiffs performed; and

11 I'll let them tell you what they did.  The one that

12 struck me most in preparing for this case, preparing for

13 this case for trial, is the tremendous amount of

14 janitorial work that the Plaintiffs had to do.

15          You'll hear the Plaintiffs, who the

16 Defendants call executives, had to clean baseboards, had

17 to sweep, had to dust, had to change lightbulbs, had to

18 wash windows, had to clean bathrooms, had to clean

19 toilets, had to fix toilets.  And you'll hear that the

20 Plaintiffs spent more of their time doing those

21 janitorial work, janitorial duties, than they spent

22 doing the duties that the Defendants say make them

23 executives, Defendants say make them managers.  You'll

24 hear that from the Plaintiffs.  And what you will hear

25 is that the Plaintiffs actually spent -- actually spent

1   80 to 95 percent of their time performing practically

2   the same jobs that the Associate performed.

3               Now, you will also hear -- well, before I

4   go there, let me talk to you a little bit about a couple

5   of witnesses who are going to come in and talk about

6   this, that the Plaintiffs spent so much time doing the

7   Associate work.  You're going to hear from Sam Wernli

8   and Michelle Williams.  Both of these individuals are

9   former Associates for the Defendants, and they're going

10  to testify that the Plaintiffs spent a tremendous amount

11  of time working alongside them doing the exact same work

12  that they were doing as Associates for the Defendants'

13  operation.

14              Now, you're also going to hear why the

15  Plaintiffs spent so much time, so much of their time

16  doing non-management work; and the reason is the

17  Defendants rarely, extraordinarily rarely -- you're

18  going to hear that.  That's the Defendants' words.  The

19  Defendants are going to testify or going to admit that

20  they extraordinarily rarely approved overtime for their

21  hourly Associates, for their hourly Front-end Managers.

22  Why?  Because it's expensive.  It's expensive to pay

23  somebody time and a half.

24              Well, what they did was they had -- they

25  called the Plaintiffs managers, now telling you they're

1  executives; and they had them pick up the slack to

2  finish the work that the hourly Associates, that the

3  hourly Front-end Managers and the hourly Assistant

4  Managers could not finish because there simply was not

5  enough time in the day and not enough time particularly

6  on their payroll, in their payroll records, to allow the

7  hourly folks to finish the work.  So the Defendants had

8  a practice of using the Executive Managers to pick up

9  that slack.

10          Now, to be fair, when it was convenient

11  for the Defendants, the Plaintiffs did perform some

12  management tasks; and you will hear them talk about

13  that.  You will hear them talk about the time that they

14  spent performing a few little management tasks here and

15  there, again, when it was convenient for the Defendants;

16  but they spent very little of their time doing it -- 10

17  to 15, maybe 20 percent of their time.  And again, the

18  hourly employees performed almost every single task that

19  the Defendants now claim made the Plaintiffs exempt

20  executives under the law.

21          In addition to that, they didn't

22  perform -- the Plaintiffs did not perform any of the

23  duties that you would expect of a manager, of an

24  executive in the Defendants' operations.  They did not

25  have significant budgetary duties/responsibilities.

1 They did not have profit-and-loss responsibilities.

2 They had no say in how the company advertised.  They had

3 no say in the company marketing plans.  They did not do

4 many of the things, once again, that you would expect of

5 an executive whom the Defendants did not pay -- to whom

6 the Defendants did not pay overtime while they were

7 working as salaried managers for the Defendants.

8                    You'll also hear about the conditions

9 under which the Plaintiffs performed these duties and

10 while they were doing non-management tasks and spending

11 a little bit of time doing management work, their days

12 were significantly severely routinized and regimented.

13 They were told what to do throughout the day.  You'll

14 hear evidence about the fact that the Plaintiffs had to

15 follow planners that came down from the Party City

16 corporate, the big Party City corporate office that

17 dictates to the Defendants' three franchise stores how

18 to market, how to merchandise their -- the items that

19 they're selling, the party supplies.

20                    You'll hear about how they had to follow

21 these corporate planners.  You'll hear about how they

22 had to follow checklists, how they had to follow to-do

23 lists.  Practically every minute of every day was

24 predetermined for what the Plaintiffs were going to do.

25 So not only did they do -- spend much of their time

1  performing non-management tasks, they did so in a way in

2  which they exercised little to no discretion over how

3  they performed those duties.  And you'll also hear

4  evidence about how the Plaintiffs were micromanaged from

5  mainly the District Manager and Ms. Amin, the owner of

6  the company.  They were constantly told how to do it,

7  how to do their jobs.  The micromanagement was intended

8  to supplement these already incredibly detailed

9  checklists, planners, and to-do lists.

10          Now, you'll notice there's just one

11  District Manager and, of course, there's only one Jaymi

12  Amin and you've got to wonder to yourself how did they

13  know what was going on in all three stores such that

14  they could dictate what the Plaintiffs were doing, tell

15  them how to do it.  They knew because the Defendants had

16  installed an extensive surveillance camera system in all

17  three of their stores.  And you'll hear testimony to the

18  effect that the surveillance camera systems really

19  weren't used so much for theft prevention.  They were

20  used for personnel matters.  They were used to watch

21  their employees, e-mail and make telephone calls to tell

22  them what they were doing wrong.  Almost always to tell

23  them what they were doing wrong.  I don't recall a

24  specific example of what they were doing right.  Now,

25  you'll hear from the Plaintiffs that they received

1  sometimes up to 30 e-mails and telephone calls a day.

2             So this is the evidence you'll hear.

3  They performed mostly non-management tasks according to

4  strict directives from the Defendants and under an

5  always watchful micromangerial eye.  Now, I want to talk

6  to you about a few of the witnesses you're going to hear

7  from today.  I've already told you about Sam Wernli and

8  Michelle Williams, both third-party witnesses who have

9  no financial stake in this case.  You will also hear

10 from several witnesses about the Defendants' general

11 attitudes toward paying overtime.  You're going to hear

12 testimony that indicates that they just didn't like

13 paying it, and that's fine.  That's fine.  It's

14 expensive to pay overtime.  But if you work somebody

15 more than 40 hours a week and they're entitled to

16 overtime, you should pay it.  And that's why we're here.

17             But you're going to hear about their

18 attitudes in general about paying overtime and one of

19 the people you're going to hear from is Jody Herrera,

20 who is a third-party witness.  She, again, has no

21 financial stake in this case.  She's not a Plaintiff.

22 She was the Defendants' bookkeeper for five years.  She

23 was the Defendants' bookkeeper until she resigned in May

24 of 2010.  And we expect her to testify that on a number

25 of occasions, Mr. Patel -- one of the Defendants in this

1  case, and one of the owners of the company -- instructed

2  her to shave time off.  Short people who had worked

3  overtime.  Don't pay them 30 minutes.  If they work over

4  40 hours in a week and they only worked 30 minutes, but

5  not 41 hours -- if they worked 30 minutes over 40 in a

6  week, don't pay them that overtime.  You pay them that

7  straight time.  Now, that adds up.  That's one person in

8  one week.  Think about it over the course of a year,

9  five years.

10         She will also testify that Mr. Patel

11  instructed her to dock people's pay 30 minutes if they

12  worked a full five hours or a full six and a half hours

13  in a day and the rational was that, well, they couldn't

14  possibly work five hours or six and a half hours without

15  taking a break; so we're just going to assume they took

16  a break and shave 30 minutes of their time.  That's what

17  Mr. Patel told Ms. Herrera to do.  That's what we expect

18  her to testify to.

19         THE COURT:  Five minutes.

20         MR. MORELAND:  Thank you, Your Honor.

21         Ms. Herrera refused to do this and when

22  she did, Mr. Patel became very angry.  So you'll hear

23  from Jody Herrera.  Now, I want to flag for you a couple

24  of -- a few things that we expect the Defendants to do.

25  One, again, they bear the burden of proof to prove that

1  the Plaintiffs were exempt executives.  Executives

2  exempt from overtime pay.  And I expect the Judge to

3  instruct you when this case is over, that you should

4  consider the Plaintiffs' job duties as a whole.  Not

5  just a few little pieces.  But the Defendants are going

6  to try to excise for you, try to cut out, little bits

7  and pieces of what the Plaintiffs were doing and mush

8  them together, mash them together, and call it the whole

9  picture.

10                 Well, don't be fooled.  And when they're

11  doing that, ask yourself:  Where do janitorial duties

12  fit into the Defendants' picture of what the Plaintiffs

13  were doing on a day-to-day basis?  Where were the other

14  non-management duties?  Where do those fit in?

15                 Now, I also expect again the Defendants

16  to talk about the Department of Labor investigation that

17  we talked about during the voir dire.  Now, bear in mind

18  that that was for a previous company and for a position

19  called Assistant Manager, which in this organizational

20  chart is an hourly position.  It wasn't called Executive

21  Manager, and it happened ten years ago.  Be cognizant of

22  these facts when you're listening to the testimony,

23  listening to the evidence.

24                 Now, I want you to listen for yourselves

25  to the evidence and judge for yourselves the

1  creditability of the witnesses in this case.  And when

2  you do, I think you'll agree with me that the Plaintiffs

3  were managers at the Defendants' convenience and I think

4  you'll agree with me that they are entitled to the fair

5  pay that they have earned working long hours for the

6  Defendants.

7               And by the time we say good-bye and we've

8  finished our work -- all of us, because you have a tough

9  job -- I think that we'll be able to look back on this

10 week, this four or five days, and say that this was a

11 good week for the American justice system.  And my

12 Plaintiffs, my clients, are asking you to use your

13 considerable power as a Federal jury and return to them

14 the fair pay that they've earned.  Thank you.

15               THE COURT:  Mr. Welch.

16               MR. WELCH:  Do you mind if I use your

17 chart?

18               MR. MORELAND:  Absolutely not.

19               MR. WELCH:  Thank you.

20               All right, to understand what the

21 Executive Manager position is, to understand how

22 important it is -- if we could turn this off Mr...

23               MR. MORELAND:  Yes, sorry.

24               MR. WELCH:  To understand exactly what it

25 is, you have to know a little bit of the history of

1  Party City.  You heard me cover this in voir dire.  But
2  because this is opening and voir dire is not on the
3  record as far as this case goes, I'm going to cover some
4  of that history again.  The company's name now is Party
5  City.  It's not always been Party City.  It used to be
6  Party Pig.  In voir dire, a lot of you said, yeah, we --
7  you kind of nodded your head, I remember where Party Pig
8  was.  It was up here on 2900 West Anderson Lane, and
9  here's how it started.

10              Mr. Patel was a General Manager at and
11 Eckerd's, which is now, what, CVS.  And he and his dad
12 learned that an operation, a little small business, a
13 little 3,400 square foot business on West Anderson Lane
14 had come up for sale.  It was run by Mr. -- a gentleman
15 named Mr. Kurtz, I believe.  Mr. Kurtz was selling his
16 business, and Mr. Patel and his dad bought it.  You're
17 going to see some pictures of that original operation.
18 It's nothing like what they're running today.  You're
19 going to see a little 3,400 square foot store, low
20 ceilings, cramped inventory bins.  Certainly not the
21 breadth of inventory that they have today.  They ran
22 that single store for 14 years.

23              In 1998, they opened two additional
24 locations.  They opened one on Brodie Lane, which is
25 where they're located now.  That's one of their current

1  locations.  They have three now.  They had a second one

2  in the Hancock Shopping Center at 51st Street and I-35.

3  That one is no longer there, but let me bring you

4  somewhat current.  I'm going to bring you to 2007.  2007

5  is going to be significant in this case.  I'm going to

6  use that date over and over.

7              But in 2007, they had all the three

8  current locations that they have right now -- Brodie

9  Lane down south of 290 in Sunset Valley, Parmer Lane,

10 and then their large one up on Balconies.  Now, remember

11 their first store was a 3,400 square foot store.

12 They've grown to say the least.  Their largest store is

13 25,000 square feet.  That's the one up on Balconies.

14 That's about the size of your average Best Buy.  And

15 you'll hear at any given time, there's typically about

16 two Executive Managers that are running or in that

17 store, the same size as a Best Buy; and for the most

18 part, they're responsible for running that store.  The

19 other two stores are a little bit smaller.  The Brodie

20 store is 10,000 square feet, and the Parmer store is

21 12,000 square feet.  So you've got the three stores.

22              So what happened in 2007?  Well, they're

23 Party City now.  They joined this national franchise and

24 interestingly enough, you would probably recognize the

25 two different logos from Party Pig to Party City.  You

1 remember they've got the kind of the whompy-jawed

2 letters of varying colors that now say Party City --

3 they used to say Party Pig -- and they looked almost

4 identical.  But they became part of this national

5 franchise, and that franchise is now what's considered

6 to be the largest retailer of party supplies in America.

7               We talked in voir dire about what they

8 sell.  They sell party supplies for just about any

9 occasion.  Halloween supplies, luau supplies, New Year's

10 Eve supplies to graduation supplies, bar mitzvah

11 supplies, christening supplies.  Again, anything you

12 could possibly want to use to decorate and festoon your

13 activity, they sell.  Their biggest season of the year

14 by far -- and it will come up in this trial -- is

15 Halloween.

16               You remember all these horrendous hours

17 that Mr. Moreland talked about that they worked, those

18 hours were done primarily during Halloween.  There's

19 about a month in the year there -- you'll see video of

20 the store from one of these surveillance cameras.  And

21 by the way, you'll hear Mr. Patel talk about how this is

22 a normal surveillance system and how he knows that from

23 working in Eckerd's and various retail stores around the

24 country.  You'll see video of how packed the place gets

25 at Halloween.

1            These folks are Executive Managers.

2  They're there to make sure the store runs properly.

3  They work some long hours during that month.  You'll see

4  all their time records.  They work between 45 to 55

5  hours, more or less, a week.  Mr. Moreland had a graph

6  up there and they averaged, what, 50 to 55, sometimes 60

7  hours.  So, you know, sometimes they would work 70, 80

8  hours.  There might have been a time or two where they

9  worked 90 or 100 hours, but they're rare.  It's

10 seasonal, and typically at Halloween.

11            So we've got Halloween supplies.  I've

12 already talked about the different supplies that they

13 do.  Again, the Patels -- the Patels still own it,

14 Mitesh Patel, Jaymi Amin.  Their father is still a part

15 owner, also.  The issue that you're going to decide is

16 whether or not these Executive Managers qualify for the

17 managerial exemption.  The executive exemption.  You'll

18 hear it called both during this trial.  The -- and here,

19 I'm going use Mr. Moreland's chart, you do have what I

20 call the dilemma of the middle manager.

21            You remember during voir dire there was

22 some discussion about some complex Federal regulations

23 and it gets a little difficult to figure out sometimes

24 when somebody is an executive employee.  When they have

25 enough managerial duties to qualify to be exempt.

1  You've got different levels of folks here.  By the way,

2  the Front-end Manager and the Receiving Manager are two

3  different positions; but they're both -- they both have

4  managerial duties.  The Assistant Manager has managerial

5  duties, too.  Mitesh and Jaymi Patel, Jaymi Amin and

6  Mitesh Patel have managerial duties, too; but nobody is

7  going to dispute that they're managerial and that

8  they're exempt.

9              So at what point do you accumulate enough

10 managerial duties to be considered exempt, and that's a

11 difficult question.  That's why we're here today.

12 That's why the parties have spent hundreds of thousands

13 of dollars in fees to get to this point because we have

14 a stack of Federal regulations -- here is a slender,

15 sliver of what they are in microprint; this is only

16 about 50 pages out of a few hundred -- that tell you

17 what an Executive Manager is.  How is an employer

18 supposed to read this and figure out whether they're

19 going to get sued because maybe they classified a

20 manager incorrectly.  That's what we're here to figure

21 out.

22              Now, here's what the regs tell you and I

23 believe the Judge is going to instruct you on this at

24 the end of the trial.  You're going to get what's called

25 a jury charge and it's going to have instructions.  It's

1 going to have questions.  You're going to answer some

2 questions.  It will have instructions on how to answer

3 those questions.  The regulations don't really define

4 what a manager is.  They don't really define what a

5 managerial duty is.

6                    What they do is give you a bunch of

7 examples.  Let me read you some of those examples.

8 Interviewing; hiring; firing; selecting and training

9 employees; scheduling their work; drafting weekly

10 schedules; adjusting hours of work; supervising the work

11 of employees; maintaining production or sales records

12 for use in supervision or control of employees;

13 evaluating employees for promotions, demotions, pay

14 raises; handling employee complaints and grievances;

15 disciplining employees.  Here it will be called

16 counseling.  They have counseling forms.  You'll see a

17 bunch of that.  You'll see these Executive Managers

18 counseling people in writing.  Planning employees work,

19 planning how the work is to be done, apportioning work

20 among employees, monitoring safety, providing for the

21 safety and security of employees or the store's

22 property, bringing in employees to replace employees

23 already on schedule who call in sick, providing verbal

24 feedback to employees regarding their performance,

25 handling customer complaints, closing the store.

1          You'll hear a lot about this.  Their

2    activities like counting down the cash.  It's a cash

3    register reconciliation process.  Remember, this is --

4    one of these stores is 25,000 square feet.  They have a

5    lot of cash registers, and it's a significant operation

6    at the end of the day.  Preparing bank deposits, filling

7    out reports of sales performance and events throughout

8    the day, putting the money in the safe at night.  Each

9    one of those duties the Federal regulations or case law

10   give as examples of what is a managerial duty.

11          We've already deposed the Plaintiffs in

12   this case or five of them.  The five named Plaintiffs.

13   There are 16 Plaintiffs.  But the five named Plaintiffs

14   who came together and filed this lawsuit, I've deposed

15   them in a deposition with a court reporter.  They

16   admitted they did every one of these things.  I asked

17   them:  Did you consider that to be a managerial duty?

18   They said yes to every single one.

19          Now, let's think about it.  What is the

20   quintessential managerial duty?  Hiring, interviewing,

21   and firing.  It doesn't get much more managerial than

22   that because when you hire somebody, what do you have to

23   know?  You have to know what happens in store

24   operations.  You have to know what a cashier does.  You

25   have to know what the Receiving Manager does when these

1   big trucks full of inventory come in.  You have to know

2   how to distribute the inventory throughout the store.

3   You have to know everything about the entire store if

4   you're hiring people.

5              Firing is the same thing.  Never mind the

6   effect it has on the person that you have to fire

7   unfortunately; but you have to make a determination when

8   you're firing someone, that they're no longer valuable

9   to the success of that store.  They don't -- for

10  whatever reason, they can't -- and we've all been fired.

11  I've been fired.  You are no longer viable to the

12  success of that store's operation.  The same thing when

13  you're hiring them.  You have to know what's going to

14  make that store successful.  Again, how does it get more

15  managerial than that?

16             This position here, the Executive Manager

17  position, never mind that whole list of things I just

18  went through that they do.  It has particular importance

19  to this operation, and this has to do with the

20  franchise.  The franchise that they joined in 2007.

21  You'll hear Mr. Patel testify about why they joined the

22  franchise.  And here's how he describes it.  Apparently,

23  they have this concept.  It's called one brand, one

24  vision.  And all that means is throughout the country --

25  I call it the Olive Garden rule.  Okay?  You can go to

1 any Olive Garden in the country, whether it be Boston,

2 Massachusetts, or Austin, Texas, and your fettuccine

3 alfredo is going to taste exactly the same.  The

4 interior of that store or that restaurant will be

5 exactly the same.  The menus will be exactly the same.

6 And what that does is it gives you a national customer

7 base.

8                    That's the benefit to M. Patel Enterprise

9 of being part of this national franchise.  It's

10 extraordinarily important to them.  Well, that requires

11 a stunning amount of standardization.  If you come into

12 a Party City in Austin, Texas, you can be sure that it

13 will look almost identical, if not identical to one in

14 Boise, Idaho -- I don't know if we have a store in

15 Boise, my guess is we do.  You'll find the same

16 merchandise, the same costumes, the same look and feel,

17 the same signage.  It will be festooned for the same

18 season.  You'll hear a lot about that.  We change

19 seasons frequently.  I think there's -- we just went

20 from the luau, which is some summer theme, to Halloween,

21 which is another theme.  And this requires -- and we're

22 about to transform into another theme.  I'm not sure

23 exactly what that is.  I'm sure we'll hear.

24                    But the point is, any store that you go

25 to throughout the country, it will be themed the same.

1   It will have the same signage.  It will have the same

2   everything.  And, again, that creates a national

3   customer base.  You're no longer mom-and-pop Party Pig

4   where you're having to come up with this stuff on your

5   own.  You have a national customer base.  And there are

6   other benefits.  For example, you get national

7   advertising -- television, print, radio.  You get

8   product support.  You'll hear a lot about planograms.

9              A planogram is basically a plan that came

10  from corporate that tells you here's how the inventory

11  needs to be displayed.  You'll hear about, for example,

12  there's a Hello Kitty planogram and you may be familiar

13  with what that product it.  It will tell you how to

14  display that merchandise.  It will have signage that you

15  put out.  You get all of that.  This national

16  merchandise signing is coordinated for you at corporate.

17  That's a huge benefit.  You decorate your store.  It

18  helps move product.  The buying power, you've got the

19  buying power of a national chain.  You don't pay as much

20  for your inventory.  You get buying powers in regards to

21  shipping.  Your shipping is cheaper because you've got a

22  huge negotiating arm here that can control or help lower

23  your shipping charges.

24              And here's how it ties into the Executive

25  Managers.  Remember, I said the evolution, the history

1  of this store tells you how important the Executive

2  Managers are to this operation.  The Executive Managers

3  are the frontline, salaried managers who are responsible

4  for implementing these corporate directives.  And there

5  are consequences for not implementing those corporate

6  directives.  You're going to hear about these things

7  called -- you're going to hear about these things called

8  weekly planners.

9            This is a weekly planner.  You see a

10  calendar on the front.  These are fairly thick.  There's

11  a lot of information in here.  You've got price changes.

12  It tells you when the seasonal changes are.  Remember,

13  luau theme to Halloween theme.  It tells the stores

14  here's the signage that needs to be put up.  Corporate

15  would ship out the signage to them.  You would have to

16  change out inventory.  Suddenly we go from no Halloween

17  stuff or less Halloween stuff, and we're going to

18  transition into some other season.  The corporate

19  directives contain all that.  National pricing, pricing

20  changes.  It has coupon campaigns.  We're running a

21  coupon on party hats are now cheaper this month, and

22  it's a national campaign.  Remember, you've got national

23  advertising.  You've got national coupons.

24            These weekly planners contain all those

25  corporate directives.  The Executive Managers are the

1    frontline managers who are responsible for making sure

2    all that gets implemented and these directives, as

3    you'll hear from Mr. Patel, are enforced by corporate.

4    They send in secret shoppers, secret inspectors.  And

5    what happens is if you're not complying with this, you

6    lose -- you could lose your franchise.  And you'll hear

7    that's exactly what happened in 2007.

8                    In 2007, some inspectors from corporate

9    came into one or more of the three Party Cities and we

10   got a termination letter that said something along the

11   lines of if you don't get this fixed, you're going to

12   lose your franchise.  And Mr. Patel will readily admit

13   we were still running Party City as if it were still

14   Party Pig, where we made all the decisions.  We weren't

15   implementing -- our Executive Managers weren't

16   implementing what they needed to from corporate and we

17   almost lost our franchise.  And when they lose their

18   franchise, they don't only lose -- they don't get to

19   revert back to Party Pig.  They can't.  There's a

20   noncompete that says you have to shut down.  You can't

21   even operate a Party Pig because the franchisor is going

22   to come in and open up some more Party Cities.  You're

23   out of business.  This is their occupation.

24                   And I say this because now we've got it

25   running right.  The Executive Managers are implementing

1   the policies they need to, but it shows you how

2   important this Executive Manager position is to Party

3   City's operations and how much we rely on them.  They

4   will agree, because unless they change what they

5   testified to, that their managerial duties -- that long

6   list I went over with you, everything I've talked

7   about -- they agree that their primary responsibility,

8   their primary job, the reason they were there -- you'll

9   hear them describe it in different ways, but it sounds a

10  lot alike -- their primary reason for being there was

11  their managerial duties.

12              The Court will instruct you that you can

13  spend less than 50 percent of your time on managerial

14  duties.  Remember, I talked a little bit about that in

15  voir dire or I asked somebody:  Do you think that if

16  someone spends less than 50 percent of their time on

17  managerial duties, that they can still be considered

18  managerial?

19              And she answered -- happens to be correct

20  with what I think the Judge will instruct you -- that,

21  yes, if you spend less than 50 percent of your

22  managerial duties, you can still be considered exempt.

23  And that's what happened here.  I don't think anyone

24  is -- Mr. Patel thinks it's about 40 percent of their

25  time.  But the primary reason they were there was to

1   manage this company.  They hired and fired.  They did

2   all the quintessential things that I think and I hope

3   you think most people associate, including the Federal

4   government who issued a bunch of regulations listing

5   examples of what constitutes a managerial duty, that

6   their primary job was managing the company.

7                 All right, it's already started.  I call

8   it dumbing down the duties.  Mr. Moreland certainly gave

9   you a taste of what you're going to hear.  They're going

10   to try and --

11                  THE COURT:  Two minutes.

12                  MR. WELCH:  Thank you.

13                 They're going to try and dumb down the

14   Plaintiffs or what they did.  They're going to say,

15   well, we cleaned the bathrooms at times.  They may say

16   they cleaned the bathrooms a lot; but they're going to

17   dumb down the extent of their responsibilities, what

18   they were responsible for on a day-to-day basis.  And

19   why?  Because they want to win.  They want to get some

20   money.  That's why they're here.  They may honestly

21   think they're entitled to it, but the goal is to make

22   you think that their managerial duties weren't what they

23   were there for.

24                 And as you may expect, we're going to

25   talk about how important the duties were.  I already

1  have.  You've seen the two opposing sides.  Is there an

2  objective source of information on the issue?  Yes,

3  there is.  Their resumes.  You'll see a bunch of their

4  resumes that they circulated to gain employment after

5  they left.  This is what they told potential, future

6  employers as to what they did.  And there's no fudging.

7  I think that was a term used when we were asking

8  about -- Mr. Moreland was asking about the importance of

9  resumes.  They identified the vast majority of what the

10 Government says are managerial duties as what they did.

11 Hiring, firing, supervising 50 employees.  All the

12 things that would be considered managerial.  Okay?  So

13 were they stretching the truth then, or are they

14 stretching the truth now?  That's the quintessential

15 question.

16          The second objective source, Patti

17 Tomasek.  She was our District Manager during the time

18 most of these folks were there.  Intimately involved

19 with their day-to-day activities, what the Executive

20 Managers were responsible for.  She no longer works for

21 us.  She left for personal reasons.  Her mother was

22 sick.  She hasn't worked for us for over a year.  She

23 has no financial ties to us.  She's not going to try and

24 work for us again.  She'll tell you that she is

25 absolutely unbiased and doesn't care who wins one way or

1  the other.  I've deposed her, too.  And she will tell

2  you that she thinks that their positions were managerial

3  and that that was the real reason they were there, to

4  exercise those managerial duties.

5                    THE COURT:  It's time.

6                    MR. WELCH:  Can I have 30 seconds, Judge?

7                    THE COURT:  Just wrap it up.

8                    MR. WELCH:  Thank you.

9                    The Plaintiffs go first.  They're going

10 to call Mr. and Mrs. Patel.  They're probably going to

11 call some of my witnesses.  And you will hear me -- I'll

12 probably do a little cross-examination on my own client,

13 but you'll hear me say frequently I'm going to reserve

14 for our case in chief to present some of the testimony I

15 want to elicit from them.  So just because I don't go

16 into some of the items that Mr. Moreland goes in with

17 the Patels, please wait for our case in chief.  They'll

18 rest their case.  Then I'll start my case.  It may be a

19 few days from now, but I get to present my evidence in

20 an orderly, coherent manner, too.

21                    So I ask that wait, please, and listen to

22 what my clients have to say in our case in chief.  Thank

23 you very much.

24                    (End of Opening Statements)

25

1            REPORTER'S CERTIFICATION

2

3       I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best

6   of my ability.

7

8

9

10

11   _____/S/_____        ___July 10, 2012___

12   PAIGE S. WATTS, CSR, RPR            Date
     Deputy Official Court Reporter
13   State of Texas No. 8311
     Expiration Date:  12/31/12

14

15

16

17

18

19

20

21

22

23

24

25