<pre>
 1            IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                    AUSTIN DIVISION
 3  ABIGAIL F. RANSOM, BONNIE    *
    KURZ, LORI A. HOPMANN, VERNON *
 4  K. HENNEMAN, JR., and DANIEL  *
    W. OWINGS, Individually and   *
 5  On Behalf of All Others       *
    Similarly Situated,           *
 6           Plaintiffs,          *  Civil Action No.
    v.                            *    A:10-CA-857-AWA
 7                                *
    M. PATEL ENTERPRISES, INC.,   *  Jury Demanded
 8  M. PATEL ENTERPRISES, INC.    *
    d/b/a PARTY CITY, M. PATEL    *
 9  ENTERPRISES, INC. d/b/a PARTY *
    PIG SUPERSTORE, MITESH M.     *
10  PATEL, and JAYMINI AMIN,      *  November 14, 2011
    a/k/a JAYMI PATEL,            *
11           Defendants.          *  Austin, Texas
12             EXCERPT OF TRANSCRIPT OF TRIAL
               THE CLOSING ARGUMENTS FOR BOTH
13               PLAINTIFFS AND DEFENDANTS
             BEFORE THE HONORABLE ANDREW AUSTIN
14             UNITED STATES MAGISTRATE JUDGE
                        AND A JURY
15
16  APPEARANCES:
    For the Plaintiffs:      Mr. Edmond S. Moreland, Jr.
17                           FLOREANI MORELAND, LLP
                             13500 Ranch Road 12, Suite E
18                           Wimberley, Texas 78676
19                           Mr. David Weiser
                             Mr. Adam Casner
20                           KATOR, PARKS & WEISER, PLLC
                             1609 Shoal Creek Blvd.
21                           Suite 201
                             Austin, Texas 78701
22
    For the Defendants:      Mr. Justin M. Welch
23                           BLAZIER, CHRISTENSEN, BIGELOW,
                             & VIRR, PC
24                           221 West 6th Street
                             Suite 2000
25                           Austin, Texas 78701
</pre>

1    APPEARANCES(cont.):

2

     Court Reporter:          Paige S. Watts, CSR/RPR
3                             DEPUTY OFFICIAL COURT REPORTER
                              1016 La Posada Drive
4                             Suite 294
                              Austin, Texas 78752
5

          (Proceedings recorded by mechanical stenography,
6    transcript produced by computer)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Closing Arguments)
 2                    THE COURT:  All right.  With that, I will
 3   recognize the Plaintiff.
 4                    MR. MORELAND:  Thank you, Your Honor.
 5                    Good afternoon.  Fair pay for long hours.
 6   That's what this case is about.  It's what I told you it
 7   was about during opening statement.  Fair pay for the
 8   long hours that the Plaintiffs worked to help make the
 9   Defendants' business profitable.  That's what this case
10   is about.
11                    Before I get to the specific evidence in
12   this case, let me put into perspective the long hours
13   that the Plaintiffs worked for the Defendants.  I have
14   on the screen Plaintiffs' Exhibit 1, P-1.  If you look
15   in the lower right-hand corner, you'll see that number
16   8,088.27 hours.  That is the amount of time for which
17   the Plaintiffs are, in this case, seeking their fair
18   pay.  Now, what does 8,088.27 hours mean?
19                    Just to put it in perspective, there are
20   about -- well, there are 8,760 hours in a single year.
21   8,088.27 hours is 12:01 a.m. from January 1st until at
22   least December 3rd of a single year and every moment in
23   between.  That is the time.  That is the amount of time
24   that the Plaintiffs in the case are seeking their fair
25   pay.  And as the evidence has proved and that I will
```

1  discuss here in a moment, the Plaintiffs were managers

2  only at the Defendants' convenience and they were

3  managers largely in name only.

4  Now, before I get to the evidence that

5  proves that, even though the Defendants have the burden

6  of proof, I will discuss the evidence that proves that,

7  I want to thank you for being here.  I know that being

8  here over the last week has taken a heavy toll on some

9  of your schedules, but I also know that that kind of

10  generosity that y'all have shown to both sides in this

11  case is exactly the type of generosity that the

12  constitution anticipates and it's exactly the type of

13  generosity that the constitution anticipates to preserve

14  this right, the right to trial by jury, that some of the

15  founders thought was more important than the right to

16  vote for a healthy democracy.  So the Plaintiff's team

17  on behalf of Ms. Ransom, Ms. Hopmann, Ms. Kurz, Mr.

18  Henneman, Mr. Owings, and the 11 other people that they

19  represented in this case, we thank you for your time.

20  Now, I would like to review some of the

21  evidence y'all have heard this week.  I'm not going to

22  review it all.  And we believe that the evidence proves

23  that the Plaintiffs' primary job duty -- and that's the

24  main issue y'all are going to be called on to decide --

25  the Plaintiffs' primary job duty was not management of

1  Defendants' enterprise.  If Plaintiffs were managers,

2  they were managers at the Defendants' convenience.  And

3  I'm going to use that charge that the Judge has read to

4  you, excepting the typo, and I will use it as a road map

5  to discuss what I think is the more important and more

6  telling evidence in the case, if I can just take a few

7  more minutes of your time.

8              First of all, make no mistake about it.

9  The Defendants have the burden to prove in this case

10  that the Plaintiffs were plainly and unmistakably --

11  those words are very important -- that the Plaintiffs

12  were plainly and unmistakably executives exempt from the

13  protections from the Federal overtime and minimum wage

14  laws in this country.  And the law does that on purpose.

15  They want to make it hard on Defendants not to pay

16  people overtime and minimum wages.  And the Defendants

17  have not carried that burden of proof in this case.

18              First, before I get to the more specific

19  issues in the case, let me just point out that the title

20  of the position in this case is Executive Manager.

21  Obviously, job titles alone aren't enough.  The Judge

22  has instructed you on that, and that's on page 6 of your

23  charge.  Job titles alone were not enough, so this would

24  be an easy case because they are Executive Managers.

25  That's what the Defendants call them.  But y'all can't

1  go -- or y'all -- the Judge has instructed you not to

2  look just at job titles.  You have to look at what my

3  clients were doing on a day-to-day, on a week-to-week

4  basis and what they were, in fact, doing.  Not what the

5  District Manager has speculated on what they should be

6  doing.  And along these lines, you should place a major

7  emphasis on the Plaintiffs' job duties as a whole as the

8  Judge has instructed you to do so on page 6 and we

9  discussed this during opening statement a little bit.

10              Now, the Judge has given you some

11 instructions to determine what primary duty means and

12 what y'all are going to be called on here to decide this

13 afternoon.  And the Judge has listed a number of

14 management duties.  I'm not going to go through them

15 all.  Y'all have heard all the testimony of all the

16 Plaintiffs and all the Defense witnesses in the case and

17 I don't think -- I know that the Plaintiffs did not

18 perform all those management duties that are listed

19 there in the Court's charge to the jury.  In fact, I

20 don't think they performed most of those duties.  And to

21 the extent that they have, you heard the Plaintiffs.

22 They spent precious little time doing so.

23              They did do some of them, no doubt; but

24 they spent precious little time doing so.  Some of the

25 Plaintiffs disciplined.  You heard Ms. Hopmann and

1  Ms. Mosley.  They were told we couldn't discipline at

2  all.  Now, the major point here is that the Plaintiffs

3  spent precious little time doing those few management

4  duties that they did, in fact, do that are listed in the

5  Court's charge.  And you also heard all the Plaintiffs

6  who testified about this, testify that I spent more of

7  my time doing janitorial work than the management duties

8  that the Court has listed for you in this charge.

9            Now, the Court has also asked you to

10  apply four factors.  It says you may apply these four

11  factors.  And you can find these on pages 6 and 7 of the

12  charge.  And it says these factors include but are not

13  limited to four areas, and I'm going to discuss those

14  four areas for you, if I may, and draw the evidence into

15  those four factors very briefly.  Now, I'm not going to

16  discuss them necessarily in the order that the Judge has

17  given you; but let me just go through them, if I may.

18            The amount of time spent performing

19  exempt work.  That's one of the factors that the Judge

20  has -- the Court has instructed you to use to determine

21  whether or not the Plaintiffs were -- the Plaintiffs'

22  primary job duties were management of the Defendants'

23  enterprise.  You heard the evidence.  You heard from

24  Mr. Wernli.  You heard from Ms. Williams.  Two

25  third-party witnesses.  The Plaintiffs spent 80 percent,

1  90 percent, up to 95 percent according to Ms. Williams,

2  95 percent of their time performing non-management

3  work -- cleaning bathrooms, cleaning windows.  The

4  Defendants tried to claim that sometimes you may see the

5  Plaintiffs cleaning a window, but I think they're

6  actually training somebody to do that.  Do you remember

7  that testimony?

8           Now, the second factor that y'all are to

9  apply is the relative importance of the exempt versus

10  the nonexempt duties.  And the evidence and the

11  testimony we've presented in this courtroom I think

12  shows you and I think you know what the primary -- what

13  the most important thing that the Plaintiffs did in this

14  case was to fill in the gaps, to pick up the slack, to

15  finish all the work that the hourly employees could not

16  finish.  Why?  Because the Defendants budgeted too few

17  payroll hours of the hourly employees to do that.  And

18  they expected -- that's their word.  It is the

19  expectation of Party City that the Executive Managers

20  and other salaried management should finish that work,

21  no matter how long it took.

22           That was the most important thing that my

23  clients -- that is the most important duty that my

24  clients performed for the defendants in this case.

25  After all, you heard Mr. Patel testify today that the

1  work of the Executive Managers did not help them make

2  5 million, 5.5 million, 6 million, or 6 and a half

3  million over the last several years.  The Plaintiffs

4  were managers only at the Defendants' convenience.

5              You also heard testimony that hourly

6  employees -- Assistant Managers, Front-end Managers,

7  they could do many, most if not all -- well, most.

8  We'll talk about the ones they didn't do.  They did

9  almost every single job that the Defendants now claim

10  make the Plaintiffs exempt executives.  Executives

11  exempt from the protections of Federal law.  Now, the

12  only thing the Assistant Managers and Front-end Managers

13  could not do was hiring, firing, interviewing,

14  scheduling, maybe disciplining.  I think they had to

15  have somebody there.  I think that's what the testimony

16  was.  They had to have an Executive Manager or higher

17  there.

18              Well, you heard the testimony about how

19  often they hired and fired.  Mr. Owings had been there

20  for almost four years, "I fired one person in four

21  years."  They spent precious little time doing these

22  things.  The only things that the hourly Assistant

23  Managers could not perform -- and Crystal Waters, you

24  heard her testify she could do everything that the

25  salaried management could and she was hourly, when she

1  could do every single one of those job duties.

2            The third factor that you should consider

3  in determining whether or not the Plaintiffs' primary

4  job duties was -- primary job duty was management of the

5  Defendants' enterprise, is their relative freedom from

6  direct supervision.  And I'm not going to go over the

7  planners and checklists and to-do lists that y'all have

8  heard about a lot over the last few days.  If you care

9  to look at them, they're Plaintiffs' Exhibit 19 through

10 35.  But the evidence in the testimony is pretty clear.

11           Ms. Amin admitted that the Plaintiffs

12 were required to follow these documents to a T.  To a T.

13 And these documents pretty much dictated and regimented

14 what the Plaintiffs were supposed to be doing on a

15 minute-to-minute, hour-to-hour basis.  And they had to

16 follow them to a T.  Ms. Tomasek testified they had to

17 follow them to the T.  Getting back to relative freedom

18 from direct supervision, the Plaintiffs were also

19 micromanaged.  You heard the testimony about that.

20           You heard the testimony about how they

21 received constant e-mails, constant telephone calls from

22 upper management telling them how to do their job, how

23 to do their job better, what they were doing wrong.  And

24 how did they do that?  Through the extensive

25 surveillance camera system that was installed in all

1  three of the Defendants' stores that Ms. Tomasek

2  testified was installed probably or used probably more

3  often for personnel matters than for security and

4  shrink.  Probably more often for personnel matters than

5  security or shrink, they used this camera system

6  installed in all three stores.  Ms. Amin taught

7  Ms. Tomasek how to use this camera system and told her

8  that it was to be used for personnel matters.

9             Now, the fourth factor that you are to

10  consider is the relationship of the Executive Manager's

11  salary to the wages of a comparable hourly employee.

12  And to our way of thinking, the comparable hourly

13  employee here is this Assistant Manager position that

14  reports directly to the Executive Manager.  And you

15  heard Mr. Gilbertson testify that the Assistant Manager

16  position, he hired a woman named Liz Creme into that

17  position.  Hired her at $10 an hour, maybe 10.50 an

18  hour.  Let's just use $10 an hour to make this

19  comparison.

20             Now, you also heard six of the Executive

21  Managers testify about their effective hourly rate.  You

22  heard Mr. Henneman testify that he his effective hourly

23  rate was $7.49 an hour.  He was a salaried manager

24  making $7.49 an hour averaged out over his employment.

25  Ms. Kurz made about $14.21.  But averaging all six of

1  these Plaintiffs together, all six of these Executive

2  Managers who testified, I come up with an average of

3  about $11.23 an hour across all six whose testimony you

4  have before you.  That is a difference, $11.23 minus 10,

5  $1.23 more per hour is that the Plaintiffs made over an

6  hourly employee doing largely the same job duties.

7              Now, the Defendants are going to try to

8  get you to do another comparison.  I've given you an

9  hour-to-hour comparison.  How much one person makes per

10 hour compared to how much another person makes per hour.

11 Now, that is an apples-to-apples comparison.  I don't

12 know of another way to compare time to time, other than

13 hour to hour; but I suspect the Defendants are going to

14 call on you to do it and I suspect it's going to be more

15 like an apples-to-lawn mower's comparison.

16             Now, I want to remind you of the last two

17 factors that I've just discussed -- the relative freedom

18 from supervision, the checklists, the micromanagement,

19 surveillance camera, and the $1.23 per hour difference

20 between what the Executive Managers made per hour and

21 what the Assistant Manager made per hour.  And I want to

22 draw your attention to one sentence in the Court's

23 charge.  You're, of course, supposed to consider the

24 charge and use the charge as a whole; but there's one

25 sentence in there that's very important.

1          It reads at page 7:  However, if such

2  Assistant Managers -- and such Assistant Managers refers

3  those Assistant Managers who are doing less than 50

4  percent, performing less than 50 percent non-management

5  work -- if such Assistant Managers are closely

6  supervised -- and the Plaintiffs here were -- and they

7  earn little more than nonexempt employees -- $1.23 an

8  hour -- the Assistant Managers generally would not

9  satisfy the primary duty requirements.

10          That is the issue that the jury is being

11  called on here today to decide.  Whether or not the

12  Plaintiffs' primary duty was management of the

13  Defendants' business.  Now I ask that you, as a jury,

14  consider the evidence.  The Executive Managers have

15  taken the stand.  Many of them.  This is a collective

16  action, so they're testifying on behalf of 11 other

17  folks in this case.  The Executive Managers who have

18  testified, have taken the stand, have looked you in the

19  eye and told you what they've done on a day-to-day

20  basis.

21          The Defendants have done what I suggested

22  they might do in opening but there's a little twist.

23  They have taken snippets of what the Plaintiffs were

24  doing on a day-to-day basis and tried to convince you

25  that that is a full picture of what they were doing on a

1    day-to-day basis.  Now, the twist is they repeated it

2    over and over and over again; apparently in hopes that

3    you would think that this picture that they're creating

4    is actually bigger than it is.  Well, I know that you

5    know just saying stuff doesn't make it so.  And I know

6    that you know that just saying stuff over and over and

7    over again doesn't make it any more so.

8                    The Defendants have failed to prove that

9    the Plaintiffs were plainly and unmistakably executives

10   exempt from the protections of Federal overtime and

11   minimum wage laws.  And if you agree and if you believe

12   that the evidence supports that conclusion, when you

13   retire to the jury room and you get this verdict form in

14   front of you, the Plaintiffs ask that you answer

15   Question No. 1 no.  No, because the Defendants have

16   failed to carry the burden to prove that the Plaintiffs

17   were plainly and unmistakably exempt executives.

18                   Now, the second question you're going to

19   be called on to ask -- to answer, excuse me, is whether

20   or not the Defendants' violations of the law, whether

21   their illegal failure to pay overtime and in some cases

22   minimum wages according to Federal law, was willful.

23   Now, the Judge has instructed you that willful just

24   means that they knew or -- knew they were violating the

25   law or showed reckless disregard for whether or not they

1  were violating the law.  I think that's a fancy lawyer

2  way of saying that they knew or should have known that

3  what they were doing was just wrong.  They knew or

4  should have known that what they were doing was just

5  wrong, and I think they did.

6            I think they knew or at least should have

7  known that what they were doing was wrong.  It was a

8  violation of law.  Why do I say that?  First of all, you

9  heard testimony about the Defendants permitting and in

10 some cases insisting that folks work off the clock.  You

11 heard Mr. Gilbertson testify about this.  You heard

12 Mr. Gilbertson testify about Ms. Tomasek and Ms. Amin

13 walking into the location of Balconies, suggesting all

14 the work has to be done no matter how long it takes.

15 You heard Ms. Herrera testify.  Jody Herrera, the

16 bookkeeper for five years for the Defendants, testify

17 that the Defendants were not to pay or that the hourly

18 Associates were not to be paid at overtime rates for

19 time worked over 40 hours.

20            Now, you also heard her testify that

21 Mr. Patel had instructed her to dock hourly employees

22 who worked five hours or six and a half hours, dock them

23 30 minutes because, my goodness, they could not be

24 working five or six and a half hours without taking a

25 break.  Well, Ms. Herrera made sure that they were paid

1  for that if they did not take the break and when

2  Mr. Patel found out about it, he became angry.  You

3  heard Ms. Herrera testify about this.

4            Now, stepping back for a moment to this

5  issue about the Defendants instructing Ms. Herrera not

6  to pay at overtime rates persons who work over 40, but

7  not quite 41.  We're talking about 30 minutes here, 45

8  minutes there.  Mr. Patel told Ms. Herrera not to pay

9  them at overtime rates.  Now, you might be saying to

10 yourself, well, one person that's not a big deal.  One

11 person one day, that's not a big deal.  One person one

12 week, that's not a big deal.  But if this was a -- if

13 this were a policy of the Defendants, they had as the

14 Defendants said 50 to 60 Associates working at them at

15 any one time and this happened every week and even half

16 of those folks went into overtime, that is a lot of

17 money that the Defendants are not paying for people to

18 work overtime.

19            So don't be fooled by the suggestion that

20 this is a de minimis mistake.  That this is a minor

21 mistake.  Now, how else do we know that the Defendants

22 knew or should have known that what they were doing was

23 wrong?  Well, the Defendants paid overtime to the

24 Plaintiffs.  They paid overtime to the Plaintiffs in

25 2007, they stopped in April of 2008, picked it back up

1  in October of 2008, and they stopped again and they

2  stopped again for good.  Now, the Defendants have --

3           THE COURT:  Ten minutes.

4           MR. MORELAND:  Thank you, Your Honor.

5           The Defendants have spent a lot of time

6  trying to convince you that that overtime payment was

7  just a bonus.  It was a bonus that we paid out of the

8  goodness of our hearts.  That's what they've testified

9  to.  Well, how do we know that's not right?  Their own

10 check stubs call it an overtime rate.  Mr. Patel's

11 testimony was back and forth, wavering on this point a

12 little bit.  First he said that's the only way that we

13 know how to put it into the QuickBooks' system and I

14 don't really now how Ms. Herrera calculated it and then

15 later he said, well, I do know how Ms. Herrera

16 calculated it.

17           Now, we know it was overtime because the

18 Defendants called it overtime and they stopped it in

19 2008, according to Mr. Patel, because the economy was

20 caving in on us.  That's what he said on this witness

21 stand under oath.  The economy was caving in on us, and

22 we had to stop it.  But remember, he had also testified

23 that they were making $5 million in 2008, 5.5 million in

24 2009, 6 million in 2010, and they're projected to make

25 six and a half million gross revenue, according to what

1   he said last Monday, this year.  The Defendants made

2   sure the economy did not cave in on them.  What they did

3   was let the economy cave in on the Plaintiffs.

4           Final point on this question of did the

5   Defendants know or should they have known that what they

6   were doing was wrong; the DOL investigation that they

7   claim exonerates it from any liability in this case, the

8   DOL investigation ten years ago for another position for

9   another company.  Now, Mr. Patel claimed they learned a

10  lot from the DOL investigation.  Do you remember that

11  testimony?  He said, "We learned a lot from it."

12          That investigation happened in 2001 and

13  2002.  And I think, I think I heard him testify and

14  suggest that even though we learned a lot from

15  investigation in 2001-2002, we really didn't do much to

16  change that position until we got this franchise

17  agreement from Party City corporate in 2006 or 2007.

18  Now, if they really learned a lot and it was that

19  important, I don't know why it took them five or six

20  years to make any changes to this position.

21          Mr. Patel also testified that the only

22  thing he's done since then is to read the lawyerly

23  language on the DOL website, but apparently didn't hire

24  a lawyer to interpret it and he also testified -- I

25  think last Tuesday he came in and testified that I went

1  back and reread that because it was all over the news.

2  He repeated that again here today.  I don't remember it

3  being in the news; but he said it was all over the news,

4  so I went and read it and I made sure that we increased

5  the weekly salary requirement to what it needed to be.

6  As far as I can tell, those are pretty much the only

7  things they've done since this DOL investigation to make

8  sure that what they were doing was in compliance with

9  the law.  To make sure that they were paying all their

10  employees according to Federal overtime and minimum wage

11  laws.

12          The Plaintiffs have proved that the

13  Defendants knew or should have known that what they were

14  doing was wrong.  And if you agree with this, if you

15  agree that the Plaintiffs have made that showing, the

16  Plaintiffs ask that when you get to Question No. 2 on

17  the verdict form, you answer that question yes.

18          Now, I think I have a few more minutes

19  here, Your Honor; is that correct?

20          THE COURT:  You do.

21          MR. MORELAND:  Six minutes left?

22          I will talk to y'all very briefly one

23  more time; but for now, I'm going to turn it over to

24  Mr. Welch.  Thank you for your time.

25          MR. WELCH:  Well, I've got a lot to say

1  in response.  Let me just fill you in on how this works.

2  The Plaintiff gets to open the argument.  I get to talk.

3  He gets a total of 30 minutes.  I get a total of 30

4  minutes; but Mr. Moreland gets to reserve back five

5  minutes of time, and he'll speak to you again.  I don't

6  get that privilege.  I don't know what he's going to say

7  when he comes back; but undoubtedly I would have a

8  response, but I don't get the privilege of doing that.

9                    Let me point out something really

10  quickly, if I could get -- did y'all switch it off?

11                    MR. CASNER:  I apologize.  I thought you

12  were using yours.

13                    MR. WELCH:  Can I have some time added

14  back?

15                    THE COURT:  Of course.

16                    MR. WELCH:  Thank you.

17                    All right, here we go.  I don't know if

18  you picked up on this when the Judge was reading through

19  this.

20                    And I'm going to kill this switch if

21  that's all right.  It's only 30 minutes, if that's okay,

22  Judge?

23                    THE COURT:  Go right ahead.

24                    MR. WELCH:  Thank you.

25                    There are four elements to this executive

1  exemption.  You're only focusing on one of them.  This

2  is page 5 of your charge.  The only one you're focusing

3  on is B.  If you'll pick up -- in this paragraph down

4  here, it says that A is admitted, C is admitted, and D

5  is admitted.  In fact, when you look down here at the

6  bottom paragraph, you're therefore instructed that

7  Subsection A, C, and D have been established.

8  Accordingly, you should focus on Subsection B.

9           A is the salary.  They were all paid the

10  minimum salary.  C is the Plaintiffs customarily and

11  regularly directed the work of two or more employees.

12  And D is one we're going to hear about again in a moment

13  because it's found somewhere else in the charge, the

14  Plaintiffs had the authority to hire or fire other

15  employees and then it goes on to talk about or they had

16  the ability to recommend hirings and firings or

17  counselings or other changes in status and that they

18  were given -- those recommendations were given great

19  weight.  That's going to come -- it's been admitted

20  here.  It's been admitted for another element, too; and

21  I'm going to get to that.

22           But first, I want to talk about the

23  duties.  Because remember I talked about this dumbing

24  down thing you were going to hear?  The Plaintiffs are

25  going to try and dumb down the duties they had and as

1   you might expect, the Defendants are going to try and

2   dumb them up and that there were two objective sources

3   that were going to be brought in.  The resumes from the

4   Plaintiffs, I'm going to look at two of those here; and

5   Ms. Patti Tomasek, who used to be our District Manager,

6   who has no stake in this lawsuit whatsoever.  She left

7   of her own accord to take care of her mother in November

8   of this year and has no ax to grind in this suit, no

9   ongoing income, no nothing.  She has nothing left to do

10  with Party City.

11              And if you remember, I couldn't even get

12  her to talk to me during the pretrial in this suit.  I

13  had to subpoena her for her deposition, and she finally

14  came and spoke with me for an hour and a half.  She's

15  not friendly to our side.  She's probably not friendly

16  to their side.  I think she's neutral.  But let's walk

17  through the duties because that's what's important in

18  this suit.  That is what you're going to be focusing on.

19              You've got a list of duties in the

20  charge.  Remember I told you in opening, the Federal

21  regulations don't define what a managerial duty is.

22  This is a list of managerial functions.  What it does is

23  it defines it by example.  We didn't go through this,

24  but no one is going to dispute.  I tried to get a

25  definition in the Plaintiffs' depositions.  I didn't get

1  it.  I didn't think I'd get it.  I'm not sure I can come

2  up with one.

3              We have to look at the Federal

4  regulations, this stack of documents here, small print;

5  and you've got to go through there and go through a

6  bunch of definitions and figure out exactly what is --

7  what is a managerial duty.  This charge you have, you've

8  got six pages of double spaced instructions that are

9  lifted, for the most part, directly from here.  And you

10  can see the print on this.  This is 25 -- and this isn't

11  all of them.  You've got just six pages of it.  What's

12  an employer supposed to do?

13              Well, they come to -- remind me this is

14  here.  You're supposed to go down this list.  All right,

15  here's the list.  Interviewing, selecting, and training

16  employees.  That's the top one.  Remember I told you

17  that you would find that somewhere else in this charge.

18  Well, it says here -- remember on this prior page?  It

19  says that that has been -- it's not in dispute.  D is

20  already -- is not in dispute any longer.  So we know

21  that they interviewed, selected, and trained employees.

22              Now, I've gone off this list.  I've kind

23  of summarized it.  Frankly, I didn't have the list in

24  the form it's in now when I put together my closing; but

25  here's what they did and I've categorized it and I've

1  put this in the category of the number of duties that

2  were dealing with scheduling, apportioning, planning,

3  and delegating the work.  This is the same list that

4  you'll have in front of you.  They scheduled the work.

5  Remember they drafted weekly schedule?  They adjusted

6  the hours of work.  Remember if you had deliveries

7  coming in, if you had planograms that needed to be done,

8  remember the weekly planners, they had all these

9  activities, they had to incorporate that in their weekly

10  schedules; so they did the weekly scheduling.

11            They evaluated employees for promotions,

12  demotions, and pay raises.  They handle employee's

13  complaints and grievances.  They disciplined employees.

14  How many counseling records did we go through?  They

15  planned the employee's work.  How the work was to be

16  done.  They apportioned the work amongst the employees.

17  Remember the daily to-do list during the opening

18  procedures?  They had this list of stuff that they had

19  complied from the weekly planners -- corporate

20  directives; you know, do this planogram, assemble the

21  merchandise and put it where it's supposed to go; clean

22  the windows.  That's delegating the work out to

23  employees.  That's what they mean by apportioning the

24  work.

25            Supervising the work of employees.  You

1   heard that even when they were working with them on a

2   task, that's what's called a concurrent duty.  You saw

3   it mentioned in the charge.  I'll cover it briefly.

4   Even when they were working with them, they were

5   supervising the employees.  Maintaining production or

6   sales records for use in supervision or controls.

7   Remember all those reports that had to go out,

8   especially in the closing procedures?  You've got the

9   overage and underage reports from the cash registers

10  that had to be reported.  People were disciplined if

11  they were over or under on their registers.  The

12  inventory reports that had to go out.  Remember they did

13  this inventory auditing thing in the morning?  It

14  included lows-and-outs, negatives on-hand, and you

15  had -- I think it was Ms. Ransom, it was one of the

16  Plaintiffs who talked about doing full inventories of

17  the entire store.  That all had to be reported, but they

18  did those things.

19              And let me point out something from this

20  list.  One, you do not have to find -- again, we're on

21  page 6 of the charge.  You don't have to find that the

22  Plaintiffs did every single one of these duties.  You

23  see how it says in determining whether the Plaintiffs'

24  primary duty consisted of management, you are instructed

25  that management includes but is not limited to

1    activities such as.  Here are examples.  You don't have

2    to fulfill every single one of these.

3                    For instance, the very bottom one.  I

4    don't think they did monitoring or implementing legal

5    compliance matters.  I'm pretty certain we didn't hear

6    any testimony of that.  But you don't have to do every

7    single one of those.  Not only that -- and this is what

8    I'm about to get into -- you're not limited to that

9    list.

10                   Mr. Moreland said that we engaged in

11   cherry-picking.  He called it we reviewed the duties

12   they did in snippets.  There was a reason I walked

13   through for three and a half hours on Thursday afternoon

14   with Ms. Tomasek exactly what these folks did.  Remember

15   this list, this checklist with these dozens of items on

16   here -- opening procedures, closing procedures, counting

17   down the cash, remember that business?  Reconciling the

18   cash registers, counting down the safe, approving cash

19   paid out, putting money in the safe from overnight,

20   putting cash register tills in the safe, again doing

21   counseling of cashiers who had underages or overages in

22   their accounts.  I mean some of those counselings you

23   saw resulted in terminations, final warnings.

24                   The e-mail reporting, I've already talked

25   about.  Remember that long list of e-mails that had to

1  be formated just correctly?  Fourteen e-mails that had

2  to be sent out during the day, most in opening.  Some in

3  closing.  A lot had to do with helium counts.  Do you

4  remember that?  Helium and balloon sales makes up

5  10 percent of the revenue.  Don't you think that that

6  e-mail reporting on the inventory is an important thing

7  to the business?  All of these reports, all of these

8  things had to be done by the Executive Managers.

9          Now, you remember how often Ms. Tomasek

10 said the Executive Managers did that.  Closing

11 procedures, I think was 50 percent.  Opening procedures

12 were done 80 percent -- and I may have flipped that --

13 by the Executive Managers.  And remember what happened

14 even if a manager was in the store, the Executive

15 Managers were the ones who carried this out.  They're

16 the ones who made sure these procedures were

17 implemented.

18          What were some of these?  You remember

19 the CRISP walk thing?  Anybody remember that thing?  I

20 have covered a fraction of what these people did.

21 Remember this?  Oop, there we go.  CRISP walk.  Remember

22 this list?  Of course, I had it up on my video screen at

23 the time.  Look at this list of items.  That's how they

24 come up with CRISP -- Clean and Bright, Recovered, In

25 Stock, Service, company -- it just goes on and on.  I

1  could spend another day on this.  You would have rioted

2  at that point, but I could have gone into even more

3  detail of what these folks were handling on a daily

4  basis.

5           They didn't go into that kind of detail

6  with you.  Part of the dumbing down process.  And I'm

7  not dumbing this up.  This is -- these are objective

8  procedures that are found on checklists that have to be

9  done, and nobody denies that they were done.  The

10 Plaintiffs admit these checklists had to be filled out.

11 Remember most of this CRISP walk stuff had to do with

12 fulfilling the corporate directives?  Do you remember

13 that?  And I'm going to touch on that in a minute, the

14 importance of the corporate directives to the business;

15 but we're focused on managerial duties right now.

16          Did these folks have sufficient number of

17 managerial duties?  All those corporate planners, all of

18 the -- remember the weekly planners and the calendar and

19 the long list of things?  I think they had intermittent

20 broadcasts during the week.  You heard those

21 tangentially kind of mentioned.  All of those get

22 incorporated by the Executive Managers into these daily

23 duties in two ways.  Through the daily to-do lists where

24 they're apportioning out work to the various folks in

25 the morning and to be completed throughout the day, and

1  through scheduling.  Because remember in the scheduling

2  function, the scheduling had to take into account truck

3  deliveries, changes in themes of the store.  Remember,

4  for example, heard ad nauseam changing from the luau

5  summer theme to the Halloween theme.  You had to change

6  out the entire store.  Signage had to be changed.

7  Merchandise has to be changed.  Remember they started

8  apportioning -- getting more hours to apportion out.

9  They started -- we heard Ms. Tomasek say this morning

10  they started out at 300 hours during the summer.

11  Apparently that's a slower time of the year.  Then it

12  got bumped to about 400 hours during August.  Then in

13  September, they're getting 500 hours to allocate out.

14          Remember Ms. Mosley?  She was getting

15  those e-mails with Ms. Tomasek and she was getting more

16  and more hours to use during the week to get the work

17  done.  And remember she was getting more and more

18  employees to do it with?  They went from -- was it 20

19  employees up to 60?  I'm going to address that in

20  another topic.  You may be able to see where that's

21  coming from.

22          Then there were some of these smaller

23  things.  Approving coupons, they had to approve coupons.

24  They had to go up there and make sure this was an

25  applicable coupon.  I'll agree with you that's one of

1  the bigger managerial duties, but it's one of them.  You

2  had price reductions.  Remember for damaged items,

3  open-box items, they had to come op and approve those

4  kind of things and they had authority without

5  supervision from anyone else to change those prices.

6  Overseeing the wedding invitations.  With all due

7  respect to the guy unloading the trucks in the back, he

8  can't sit down with the bride and determine what her

9  wedding invitations look like; so you have an Executive

10  Manager do those because they've got to be right.

11            The balloon and helium inventory control.

12  I've already kind of mentioned that.  Made up 10 percent

13  of the store's revenue.  The Executive Managers were in

14  charge of monitoring that inventory and ordering tanks

15  and reporting the level of inventory because that makes

16  up a huge amount of Party City's business.  Now,

17  remember the list isn't a total list.  So the question

18  is:  Are all the things, the opening and closing

19  procedures that you don't see on that list, are they

20  managerial duties?  Are the coupon issues?  Are the

21  price reductions?  Are the overseeing the wedding

22  invitations or the balloon and helium inventory control

23  procedure?  Are any of those managerial duties.  Should

24  they be on the list?  Should the Government have put

25  them on the list?

1          The Plaintiffs, a Plaintiff got up on

2 each one of the things I just discussed and said, yes,

3 that is a managerial duty.  And I knew they were going

4 to say yes.  If you didn't pick up on it, I had deposed

5 them and they had already said yes and we had to

6 backtrack from time to time to confirm, you know, in

7 your deposition you said, yes, it was a managerial duty.

8 They have admitted, they have answered that question for

9 you as to those duties.

10          Ms. Tomasek said that she considered them

11 all to be managerial duties.  But remember

12 Ms. Tomasek -- did you pick up on this -- she used to be

13 the -- I forgot her title.  She supervised 130 stores

14 for Linens'n Things.  And then she was demoted to

15 General Manager, not by her fault; but because we know

16 Linens'n Things is no longer with us.  So she went back

17 down to manage a store.  If anybody knows what a

18 managerial duty is, doesn't that woman?  Linens'n Things

19 is a retail store just like we're talking about here,

20 and we're talking about retail stores.

21          Did you pick up on the instruction

22 concerning management of a retail location?  I'll get to

23 that in just a moment, too.  All right.  Let's go back

24 to hirings, firings, counselings, that kind of thing.

25 It has been admitted that they hired and fired and that

1   they had the authority to do so or at the very least,

2   their recommendations were given great weight.  It goes

3   to this element, also.  Interviewing, selecting, and

4   training employees.  Now, there's a reason with

5   Mr. Gilbertson I waded through in painful detail all the

6   hirings he had done.  There's a reason I waded through

7   with Ms. Mosley all the hirings that she had done.

8   Remember she had to ramp-up one of the stores to get

9   ready for Halloween and hired -- she said 25 folks.

10  Ms. Tomasek I thought said she brought it from 20 up to

11  50.  Regardless, somewhere between 25 and 30 employees.

12              Now, and I waded through those employment

13  forms.  Remember where they signed off as manager and

14  all that.  We didn't go over dozens and dozens of

15  similar forms with other Executive Managers.  You're

16  going to have a stack -- I don't see them.  There is a

17  stack -- there are a stack of exhibits that are going

18  back to you.  You'll find them in there.  You've see the

19  forms.  Feel free to flip through those exhibits.  I

20  would say there are several dozen of hirings, employment

21  forms, that we didn't even cover.  I'm not threatening

22  you to go through the evidence.  The evidence is done,

23  so we're not going to wade through them any more.

24              Primary duty, the question of whether or

25  not management is a primary duty.  Let's go to page --

1  oh, here we are.  We're on the page.  This is what --

2  here is what the charge is going to have in it.

3  Considering whether an employee's primary duty involved

4  management, you are instructed that the term "primary

5  duty" means the principal, main, major, or most

6  important duty the employee performs.

7          I went through that with the Plaintiffs.

8  Remember I asked them:  Did the managerial duties take

9  precedence over the non-managerial duties?  They said,

10 yes, they would leave the non-managerial duty to go

11 handle the managerial duty.  I used adjectives like was

12 that your primary duty, the managerial tasks over the

13 non-managerial?  Yes.  Were you on call -- remember

14 that -- to handle managerial duties versus

15 non-managerial duties?  What was the primary reason you

16 were there?  Isn't it true to handle managerial duties

17 over non-managerial duties?  Yes.

18          Choose your adjectives.  With

19 Ms. Tomasek, I went through those adjectives; and she

20 said, yes, the principal reason they were there was

21 managerial duties.  It was the main duty.  The major

22 duty.  The most important duty.  Nobody has said it

23 wasn't.  We're arguing about how much they did, over

24 50 percent or not 50 percent.  You know where I'm going.

25 It's in the charge, and I'll get there in just a moment.

1          Let's look at page 6.  Oh, I'm sorry.

2   It's down here.  In determining whether -- factors to

3   consider, do you see this?  Factors to consider when

4   determining the primary include, but are not limited to,

5   relative importance of the exempt duties as compared

6   with other types of duties.

7          You know, all right.  So they cleaned

8   baseboards.  I don't doubt it.  Did they clean the

9   bathrooms?  I don't doubt it.  I'm not calling Ms. Kurz

10  a liar.  I'm not going to do that.  They did it.  I know

11  that because these guys did it from time to time.

12  Ms. Tomasek did it from time to time.  It's just what

13  has to get done sometimes, but it is not the primary

14  reason they're there.

15         They are there to make sure the store

16  opens smoothly.  They're there to make sure that

17  merchandise has been filled with the proper merchandise,

18  that it follows the weekly planners.  They're there to

19  make sure that the signage is proper.  They're there to

20  make sure that the theme has been changed over from

21  summer luau to Halloween or bat mitzvah to whatever.

22  That's what they're there to do.  They're there to make

23  sure that the store closes smoothly.  They're there to

24  audit inventory.  They're there to audit cash.  They're

25  there to send all these reports to upper management so

1 upper management knows what the heck is going on in the

2 store on a day-to-day basis.  Remember they reported

3 sales, they reported their inventory auditing results.

4 They're there to make sure cash doesn't walk off.  That

5 inventory doesn't walk off.  They're there to hire

6 competent employees.  I mean if you don't know what a

7 cashier does and you hire an incompetent cashier, the

8 person cashiering is not going to be able to cashier.

9 And if you can't cashier, you can't make money.

10            I mean this is a critical hiring.  Does

11 is it get -- is there any more of a quintessential duty?

12 Is there anyone that's more important than actually

13 hiring for the business?  It's mentioned twice in here.

14 It's one of the elements of the exemption and remember

15 it's already been determined and then you find it again

16 in the list of managerial duties.  That's how important

17 it is.  That's what they're there for.  That's why

18 nobody below Executive Manager could do that because

19 it's important.  They're there not to do baseboards or

20 set up planograms or unload trucks, and there's no doubt

21 they did that from time to time.  They're there to

22 handle these managerial duties.

23            All right.  Mr. Moreland has warned you

24 about this one.  This is on page 7 of your charge.  This

25 is one of the things you can look at in determining if

1  the managerial duties were their primary duties.  The

2  relationship -- I've lost my copy.  The relationship

3  between the employee's salary and the wages paid to

4  other employees for the kind of nonexempt work performed

5  by the employee.  Mr. Moreland wants you to compare --

6  he wants to say, well, you're supposed to compare to the

7  nonexempt work that the Executive Managers were doing

8  that was like the Assistant Managers.  No, those were

9  the Associates.  They're cleaning baseboards and doing

10  the bathrooms and unloading the trucks.

11              And here's what they're getting at in

12  this.  It took me a while to figure it out the first

13  time I looked at it.  Here's what they're getting at.

14  Look at the salaries the Executive Managers are getting

15  paid.  Here -- and I'll tell you what those salaries --

16  I'll give you a range of what they were.  You might not

17  realize how much these folks were getting paid.  Look at

18  their effective hourly rate.  Remember Ms. Kurz I think

19  was making between $14.20 an hour or $15 an hour on

20  average, depending on what number of hours you used.

21  And compare that to the Associate who's getting 7.25 to

22  clean the baseboards, unload the truck, and set up the

23  planograms, also.  That's the comparison.

24              So you ask yourself why is Ms. Kurz

25  getting paid twice as much -- and I talked about that a

1  bit -- why is she getting paid twice as much as the

2  Executive Manager?  That's the comparison.  That's what

3  this is about.

4           MS. PLOWMAN:  Justin, ten.

5           MR. WELCH:  Thank you.

6           Let me put the salaries in perspective.

7  I'm still on this wage -- I call it the wage disparity

8  issue.  There are 16 Plaintiffs.  Six of them, more than

9  a third, were making between 35,000 and $46,000 a year.

10  Five of them were making, another third, between 27,000

11  and 32,000 a year.  Five of them were kind of what you

12  could call your entry level Executive Managers.  Five of

13  them made 25 grand a year.  Now, compare that to the

14  hourly Associate.

15           Remember -- what did Ms. Tomasek say?  It

16  was 80 or 90 percent, I don't remember which, of the

17  Associates were part time.  They were working she said

18  25 hours a week.  We heard from some other people it was

19  20.  Let's take the 25.  Seven times 25 is roughly $175

20  a week and that's if they work 55 weeks a year and they

21  happen to max out at the 25 hours.  I can't do the math.

22  175 times 52, I think Ms. Tomasek said it's somewhere in

23  the range of eight grand.

24           Well, you know, as an Associate you're

25  never going to be able to make the money of even the --

1  not even a fourth -- sorry, a third of the lowest paid

2  Executive Manager.  There's a reason for that.  And it

3  highlights the fact that the managers were getting paid

4  for their managerial duties.  They're not getting paid

5  for the $725 an hour -- for the $7.25 an hour work that

6  they might do from time to time or even 35 percent of

7  the time or even 50 percent of the time.

8           Mr. Henneman found that out the hard way.

9  Did you pick up on that?  He got demoted or demoted

10 himself because he didn't like working the number of

11 hours and then within a couple of weeks he went to

12 Ms. Amin, by his own admission, and said I would like to

13 re-up.  He realized and he admitted to us -- I thought I

14 had the quote down here -- something along the lines of

15 I couldn't make as much money.  Well, you couldn't make

16 close to as much money.  And not only did he now have

17 the duties of -- remember he stepped down to Receiving

18 Manager, responsible for some of the trucks.  He stepped

19 back up to the Executive Manager position and took on

20 both sets of duties.

21          Mr. Henneman, if you remember, was not

22 paid minimum wage sometimes; and I'll talk more about

23 this in a minute.  He re-upped.  He decided to take back

24 on the position again, knowing that sometimes he hadn't

25 received minimum wage; but he could make more money.

1   And remember if you're exempt, you're exempt from

2   overtime and minimum wage.  And I'll just skip to this

3   last part.  It cuts both ways.  There are times you

4   might not get minimum wage.  There are times when you're

5   going to get a lot more than minimum wage.  Ms. Kurz, I

6   mean there were times she was making 16, 17, $18 an hour

7   if you look when she worked under 55 hours.  So it cuts

8   both ways.

9           Oh, on this wage disparity thing just to

10  finish up.  The Plaintiffs would have you believe that

11  they promoted -- the Plaintiffs[sic] promoted Ms. Kurz

12  in order to get someone who could work an unlimited

13  number of hours so they don't have to pay them overtime.

14  Well, on Ms. Kurz' worst day she was getting 14.20 an

15  hour, twice minimum wage.  If that were the Patels'

16  motive, that's not smart.  Go hire a bunch of more

17  part-time folks at 7.25 an hour and with them, you just

18  hire a bunch more of them and they do the nonexempt work

19  and you don't have to mess around with classifying them

20  as exempt or nonexempt.  You don't have to worry about

21  getting sued.

22          The Patels are smart folks.  They started

23  out in 1984 with a 3,400 square foot store and have

24  grown it into what it is today -- 10,000, 12,000, and

25  25,000 square foot store.  They just hire more Executive

1   Managers.  All right, 50 percent of the time.  This is

2   another one of these items.  The amount of time -- this

3   is one of the factors in determining whether the job was

4   primarily managerial.  The amount of time they spent

5   performing the exempt work.  And there's an instruction

6   in there.  I keep walking away from my machine here.

7   Where is that?  Here we go, right here.  What that says

8   is it doesn't -- time is something to look at, but it's

9   not the ultimate guide.

10              If you spend more than 50 percent of your

11  time performing work, it will generally satisfy that

12  requirement.  Time alone, however, is not the sole test

13  and the FLSA does not require that exempt employees

14  spend more than 50 percent of the time.  You can spend

15  less than 50 percent of the time doing managerial tasks

16  and still qualify.  And that's the point.  A hiring

17  procedure.  When you bring someone in to interview them,

18  how long does it take?  Someone said 10 minutes, 15

19  minutes.  Let's say it's 20 minutes, whatever.  That's

20  not that long, is it?  But how critical is it to the

21  success of the business?

22              It's the importance of what you're doing

23  compared to the nonexempt tasks.  That's what you look

24  at, and you go down here and you have an example.  The

25  example is right under that.  All right.  Here's another

1 example.  This is the one that is pertinent to this,

2 this case.  An Assistant Manager in a retail

3 establishment, Party City, may perform work such as

4 serving customers, stocking shelves, and cleaning the

5 establishment; but performance of such nonexempt work

6 does not preclude the exemption is the Assistant

7 Manager's primary duty is management.

8            And that's the point.  You're down there

9 helping them stock, the Associates; but you're

10 supervising them at the same time.

11            How long do I have?

12            THE COURT:  You've got about three

13 minutes.

14            MR. WELCH:  All right, let me skip -- I'm

15 going to have to skip some things.  Remember, I don't

16 get to come back.  The DOL audit, my first reaction when

17 I saw this case is what are we doing here?  This has

18 already been decided by the Department of Labor, and it

19 wasn't decided by some field level investigator.  It was

20 decided by the Director of Enforcement.  Shouldn't that

21 just decide the issue, and it can.

22            Look back here.  An employer's failure to

23 pay overtime or minimum wage is not willful if the

24 failure resulted from a good faith reliance upon a

25 decision of the Department of Labor.  The Department of

1   Labor found these positions to be exempt.  How does --

2   how do you get much more of a plain and unmistakable

3   statement than that of whether these should be exempt?

4   These regulations are thick.  Shouldn't you be able to

5   rely on those regulations when determining if someone is

6   exempt?  And it gets better here for the Patels.

7               In 2004, you had the changes.  He looked

8   at the changes.  It said it broadened who was exempt and

9   not only that, in 2007 with the franchise, they took on

10  all these additional duties.  And I don't have time to

11  walk through those additional duties.  We've looked at

12  them a bit already.

13              THE COURT:  You've got one minute.

14              MR. WELCH:  Oh, willfulness.  Hourly

15  employs, all this business about shaving hours or not

16  paying overtime.  Why are we talking about hourly

17  employees?  This is about whether or not these Executive

18  Managers were exempt.  Whether they should be exempt.

19  It's all misdirection.  They should have talked about

20  the full-time, the exempt employees, the Executive

21  Managers.

22              Here is how I'm asking you to answer the

23  charge.  Do you find that the Plaintiffs were exempt

24  from the overtime pay and minimum wage provisions of the

25  Fair Labor Standards Act?  That's the question.  Did

1 they have enough managerial duties to make them

2 managerial?  Please answer yes.  If you answer yes

3 there, you don't even get to the second question because

4 down here it says if you've answered no, then proceed to

5 Question 2.  A yes means this case is over.  Finally

6 it's over for the Patels who have spent hundreds of

7 thousands of dollars to defend themselves in this

8 lawsuit.  Thank you.

9              MR. MORELAND:  During opening statement,

10 I asked for you to judge the credibility of the

11 witnesses for yourselves, to listen to the evidence.

12 And I suggested that when you do so, that you would

13 agree with me that the Plaintiffs in this case,

14 Plaintiffs who punched in and punched out every day they

15 went to work for the Defendants, I said I think you will

16 agree with me that the Plaintiffs were managers at the

17 Defendants' convenience and that they were managers

18 largely in name only.

19              Well, I think you agree with me and I

20 think you know that it was very convenient for the

21 Defendants to call the Plaintiffs managers every two

22 weeks on payday because they had the Plaintiffs finish

23 all the work that the hourly folks didn't get to and

24 they didn't have to pay them extra for it.  Very

25 convenient on payday.  But do you know when it's most

1  convenient for the Defendants to call them managers?

2  Right now.  Right before you get this case and decide

3  whether or not based on all the facts in the case, the

4  Plaintiffs were managers in fact or managers only at the

5  Defendants' convenience.

6                I think the evidence shows that they were

7  managers only at the Defendants' convenience.  Managers

8  only in name only.  And on behalf of the Plaintiffs in

9  this case, I ask that you return the verdict that we've

10 already discussed that will return the fair pay for the

11 long hours that the Plaintiffs have already given to the

12 Defendants.  Thank you very much for your time.

13               (End of Closing Arguments)

14                REPORTER'S CERTIFICATION

15

16    I HEREBY CERTIFY that the foregoing is a true and

17 correct transcript from the stenographic notes of the

18 proceedings in the above-entitled matter to the best

19 of my ability.

20

21

22 _____/S/_____        ___July 10, 2012___

23 PAIGE S. WATTS, CSR, RPR           Date
   Deputy Official Court Reporter
24 State of Texas No. 8311
   Expiration Date:  12/31/12

25